JOSÉ E. MELÉNDEZ ORTIZ y OTROS, demandantes y recurridos, v. ARTURO VALDEJULLY, DIRECTOR EJECUTIVO DE LA AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS DE PUERTO RICO y OTROS, demandados y recurrentes.

*Números:* RE-87-343 *Resueltos:* 8 de diciembre de 1987
RE-87-375

2

*Nicolás Nogueras,* abogado de los recurrentes; *Arturo Trías* y *Héctor Meléndez Cano,* de *Trías, Doval, Muñoz, Acevedo & Otero,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

Como intérprete máximo de nuestra Constitución y de nuestras leyes, este Tribunal tiene el deber ineludible de interpretar las mismas en una forma prudencial y responsable; en especial al enfrentarnos a situaciones que obviamente requieren se mantenga un fino y cuidadoso balance y, sobre todo, cuando lo que está en la balanza es nada más y nada menos que el bienestar general de nuestro pueblo.

Resolvemos los recursos ante nuestra consideración plenamente consciente de que el propósito y objetivo último de la Ley Núm. 21 de 31 de mayo de 1985 (27 L.P.R.A. secs. 261–261e) —conocida como la Ley Uniforme para la Revisión y Modificación de Tarifas— es el de proteger al consumidor puertorriqueño contra actuaciones caprichosas y

arbitrarias por parte de las corporaciones públicas a las que aplica. Debe mantenerse presente, sin embargo, que ante una crisis financiera que amenaza la existencia misma de una corporación pública cuya subsistencia es esencial a la salud de nuestro país, ciertamente no es momento para recriminaciones e imputaciones que, después de todo, no resultan beneficiosas para persona alguna, y que una interpretación extremadamente restrictiva de las disposiciones de la citada Ley Núm. 21 —la cual puede estrangular y maniatar indebidamente a las referidas corporaciones públicas— puede tener precisamente la consecuencia que nuestro legislador quiso evitar al aprobar la referida ley, esto es, el que se perjudique al Pueblo de Puerto Rico.

Juzgamos y decidimos el presente caso como siempre lo hemos hecho: con mesura, sin asumir posiciones extremas; atendiendo únicamente los dictados de nuestra conciencia; totalmente libre de preocupaciones infundadas sobre lo que se ha dicho, mucho menos sobre lo que se dirá, y con la conciencia absolutamente tranquila, producto inescapable del pleno convencimiento de que se ha actuado de buena fe en el cumplimiento del deber.

I

Se nos solicita la revisión de la sentencia dictada el día 12 de junio de 1987 por el Tribunal Superior, Sala de San Juan, en el caso de *José Enrique Meléndez Ortiz y otros* v. *Arturo Valdejully, Director Ejecutivo de la Autoridad de Acueductos y Alcantarillados y otros*. Mediante la sentencia objeto de este recurso, el tribunal de instancia determinó que la Autoridad de Acueductos y Alcantarillados de Puerto Rico (Autoridad) —al aumentar las tarifas de agua, primero, en forma temporera y luego en forma permanente— violó las disposiciones de la citada Ley Núm. 21 de 31 de mayo de 1985. En su consecuencia, dicho foro declaró nulo el aumento

tarifario temporero decretado el 31 de enero de 1986, vigente desde el 1ro de febrero de 1986 hasta el 15 de abril de 1987, y ordenó el reintegro de lo cobrado bajo el mismo. La sentencia objeto de este recurso validó el aumento tarifario permanente efectivo a partir del día 15 de abril de 1987. Los demandantes no solicitaron la revisión de este dictamen por lo cual esta parte de la sentencia recurrida advino final, firme e inapelable. Mediante la sentencia dictada, en adición, se condenó a la parte demandada al pago de las costas y al pago de la suma de $30,000 por concepto de honorarios de abogado. De esta última parte de la sentencia igualmente solicitaron revisión los demandantes.(1)

## II

El día 31 de enero de 1986, la Junta de Gobierno de la Autoridad aprobó la Resolución 1198, donde decretó, a tenor con la Ley Núm. 21 de 1985, *ante*, un "aumento temporero de tarifas ascendente a un 44.76%", efectivo el día 1ro de febrero de 1986. Según el texto de la Resolución, las siguientes razones motivaron el aumento:

> *POR CUANTO: La Autoridad de Acueductos y Alcantarillados ha sufrido un grave deterioro fiscal, operacional y administrativo durant[e] los últimos años.*

> POR CUANTO: *Ese deterioro ha sido a tal nivel que la AAA no tiene suficientes rentas para mejorar la planta física, responder a la petición de la EPA de corregir las deficiencias en sus plantas de tratamiento, responder a la urgente necesidad de implantar un programa de construcción como lo requiere el desarrollo económico de Puerto Rico y garantizar el pago de sus emisiones de bonos.*

---

(1) Alegan, en síntesis, que el tribunal de instancia venía obligado a imponerle a la parte demandada el pago —por concepto de honorarios de abogado— de una suma equivalente al 25% de la suma principal de dinero concedida a los demandantes, ello al amparo de las disposiciones de la Ley Núm. 118 de 25 de junio de 1971 (32 L.P.R.A. secs. 3341–3344).

POR CUANTO: La EPA ha advertido a la Autoridad que de no corregirse inmediatamente las fallas en 47 plantas de tratamiento de aguas se pondría en peligro la salud del pueblo de Puerto Rico.

POR CUANTO: La EPA ha manifestado su intención de pedir el cumplimiento específico de la orden del Tribunal en las próximas semanas o de lo contrario pedirá al Tribunal la imposición de penalidades a la Autoridad.

POR CUANTO: La AAA tiene una obligación con sus bonistas de garantizar con sus rentas el repago de los bonos de la Autoridad.

POR CUANTO: *Las rentas actuales no son suficientes para garantizar el repago de los bonos, lo que representaría que la Autoridad estaría en incumplimiento de sus obligaciones.*

POR CUANTO: Asesores contratados por la Autoridad y coordinados por el Banco de Fomento, recomendaron como alternativa para corregir los problemas de la AAA un aumento de tarifas de 110% prorrateado a 5 años, con efectividad a diciembre 31 de 1985.

POR CUANTO: Esta Junta rechazó dicho aumento por entender que ést[a] no es la única solución al problema y ordenó al Director Ejecutivo *la implantación de un plan de emergencia* con vías a obtener recursos que minimizarán la subida de tarifas.

POR CUANTO: El Director Ejecutivo presentó un informe a la Junta de Gobierno donde dio cuenta del éxito de las medidas de emergencia implantadas.

POR CUANTO: El Director Ejecutivo informó a la Junta que *debido a la magnitud del déficit acumulado* y a las obligaciones económicas contra[í]das por la Autoridad, a[u]n las medidas de emergencia tomadas hasta este momento no son suficientes para que la Agencia cumpla con los compromisos contra[í]dos para resolver la crisis.

POR CUANTO: Este aumento temporero ha sido calculado por los asesores de la Agencia, por el Director Ejecutivo de la AAA y el Banco Gubernamental de Fomento en un 44.76 por ciento.

POR CUANTO: [*sic*] Esta Junta de Gobierno en atención a su grave responsabilidad de garantizar el desenvolvimiento normal de esta Agencia y en atención a la seria preocupación por el futuro de nuestro pueblo, resuelve:

1. Aceptar las recomendaciones sometidas por los asesores de la AAA, su Director Ejecutivo y el Banco de Fomento de establecer un aumento temporero de tarifas, ascendente a un 44.76%.

2. Recomendar a su Director Ejecutivo y al Presidente del Banco de Fomento el continuar las negociaciones con la Farmers Home Administration y otras fuentes de financiamiento alterno, con vías a impl[a]ntar alternativas de financiamiento que permitan reducir a su expresión mínima el impacto tarifario temporero.

3. Asignar toda cantidad que se recaude por concepto de la revisión tari[f]aria, para ser utilizada exclusivamente en la construcción, mantenimiento y reparación de la obra permanente de la AAA.

4. Solicitar al Director Ejecutivo que de acuerdo a la Ley Núm. 21 del 31 de mayo de 1985, inicie los procedimientos necesarios para la impl[a]ntación inmediata del aumento temporero.

Esta Resolución fue aprobada por el voto unánime de todos los miembros de la Junta de Gobierno. (Énfasis suplido.) *Exhibit* 12, págs. 156–158.

La Resolución 1198 se le notificó a los medios de comunicación el mismo 31 de enero de 1986 y se publicó íntegramente en la prensa del país. El 13 de febrero de 1986 se publicaron los edictos anunciando las vistas a celebrarse, bajo las disposiciones del Art. 4 de la citada Ley Núm. 21, en torno al aumento tarifario "temporero" anunciado. El 27 de febrero se designó un comité examinador. Las referidas vistas se llevaron a cabo los días 28 de febrero, 7 de marzo y 1ro de abril de 1986. El Director Ejecutivo de la Autoridad, a sugerencia del comité examinador, solicitó del señor Secretario de Justicia de Puerto Rico una opinión sobre los distintos

aspectos planteados en el caso, opinión que éste emitió el 29 de mayo de 1986.

Considerado el informe del comité examinador, *la Junta de Gobierno de la Autoridad resolvió el 27 de junio de 1986 mantener mientras durase la emergencia el aumento decretado e iniciar el procedimiento provisto por ley para el aumento permanente de la tarifa,* ello de acuerdo a lo dispuesto por el Art. 3 de la citada Ley Núm. 21.(2)

El 7 de agosto de 1986 se aprobó la Resolución 1223, designando al oficial examinador que entendería en las vistas para la fijación de una tarifa permanente, según el Art. 3 de la Ley Núm. 21 de 1985, *ante.* Se celebraron las vistas públicas los días 7, 8 y 9 de octubre de 1986, tras la publicación de los correspondientes edictos. El informe del oficial examinador se sometió el día 25 de marzo de 1987. El 15 de abril de 1987 se aprobó la Resolución 1253, que establece el aumento permanente de 44.76%.

### III

La cabal comprensión de la sentencia recurrida y de la que hoy emitimos en los recursos ante nuestra consideración hace necesario que transcribamos en su totalidad la citada Ley Núm. 21 de 31 de mayo de 1985, incluyendo su exposición de motivos.

> Para establecer un procedimiento adecuado y uniforme para la revisión y modificación de las tarifas por servicios públicos básicos y esenciales de las corporaciones públicas e instrumentalidades gubernamentales análogas.

---

(2) El mes anterior, a instancias de la E.P.A. (*Environmental Protection Agency*), el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico de nuevo le había ordenado a la Autoridad la reparación y el mantenimiento inmediato de las facilidades de tratamiento de aguas, particularmente la corrección de las violaciones que directamente amenazaban la salud humana. Se le ordenó identificar y comprometer los fondos necesarios para el cumplimiento de las órdenes federales.

EXPOSICIÓN DE MOTIVOS

En el pasado, corporaciones públicas dedicadas a la prestación de servicios esenciales, tales como la Autoridad de Energía Eléctrica de Puerto Rico, la Autoridad de Acueductos y Alcantarillados de Puerto Rico, la Autoridad de Teléfonos de Puerto Rico y la Autoridad de Comunicaciones de Puerto Rico, han decretado aumentos tarifarios que han afectado a todos los abonados residenciales, industriales y comerciales.

Al examinar las disposiciones legales que rigen la facultad de estas corporaciones públicas para revisar y modificar sus tarifas por servicios básicos y esenciales, se ha constatado que los ordenamientos estatutarios vigentes son lacónicos y arcaicos, por lo que pueden dar lugar a que se utilice en forma arbitraria esta facultad.

Conscientes de la importancia fundamental que tiene la facultad de revisión de las estructuras tarifarias para la operación eficaz y saludable de estas corporaciones públicas concernidas, para los intereses de los inversionistas, para el público consumidor y para nuestra economía, mediante esta ley se establece un procedimiento justo y uniforme para precisar y asegurar el mejor ejercicio de esta potestad.

*Decrétase por la Asamblea Legislativa de Puerto Rico:*

Artículo 1.—Título y Propósitos de la Ley.—

Esta [ley] será conocida como "Ley Uniforme para la Revisión y Modificación de Tarifas" y tendrá el propósito de garantizar a los abonados o usuarios de servicios públicos unos procedimientos administrativos adecuados y uniformes para la revisión y modificación de las tarifas que por servicios básicos y esenciales prestados fijan y cobran las corporaciones públicas y demás instrumentalidades gubernamentales análogas.

Artículo 2.—Aplicabilidad de la Ley.—

Esta ley será de aplicación a la Autoridad de Energía Eléctrica de Puerto Rico, a la Autoridad de Acueductos y Alcantarillados de Puerto Rico, a la Autoridad de Teléfonos de Puerto Rico, a la Autoridad de Comunicaciones de Puerto Rico, las subsidiarias de dichas corporaciones públicas y a otras instrumentalidades gubernamentales análogas de servicios públicos

establecidas o que se establezcan en el futuro y a sus subsidiarias.

Artículo 3.—Procedimientos para Tarifas Permanentes.—

Toda autoridad, corporación pública u otra instrumentalidad gubernamental análoga que provea servicios públicos básicos y esenciales a la ciudadanía no hará cambios en las tarifas que cobra a sus abonados o usuarios por dichos servicios, a no ser que cumpla con los siguientes procedimientos:

(a) No se harán cambios de tarifas, con carácter permanente, a menos que se celebren vistas públicas debidamente anunciadas en dos (2) periódicos de circulación general en Puerto Rico, con por lo menos quince (15) días de antelación a la fecha de celebración de las mismas, indicando en el anuncio el sitio, fecha y hora en que se llevará a cabo tal vista pública, las tarifas en vigor, las tarifas que se propone adoptar y la fecha de efectividad del propuesto cambio.

(b) La Autoridad pondrá a disposición del público con suficiente antelación a la fecha de celebración de las vistas públicas, los informes o documentos de la agencia apoyando o justificando el propuesto cambio tarifario.

(c) Las vistas públicas ordenadas por este artículo serán presididas por un oficial examinador de reputado conocimiento en la estructura tarifaria de la agencia, designado por la Autoridad para tal efecto. En caso de resultar necesario transferir personal de la agencia para encomendarle la función de servir como oficial examinador durante estas vistas públicas, la persona designada no podrá haber intervenido anteriormente en la determinación del propuesto cambio tarifario.

(d) El oficial examinador escuchará los argumentos de los deponentes y les concederá la oportunidad de presentar testimonio pericial y documental. Dicho funcionario emitirá un informe, que someterá a la Junta de Directores de la Autoridad dentro de los sesenta (60) días siguientes a la fecha en que concluyan las vistas públicas, el cual deberá contener una relación de todas las objeciones, planteamientos, opiniones, documentos, estudios, recomendaciones y cualesquiera otros datos pertinentes presentados en las vistas, así como conclusiones y recomendaciones. Copia de dicho informe se pondrá a

disposición del público para examen y estudio, debiéndose notificar tal hecho a través de los medios de difusión pública. Cualquier persona interesada podrá presentar por escrito a la Junta de Directores de la Autoridad concernida sus comentarios al informe, dentro de los diez (10) días siguientes a la fecha en que el mismo haya estado a disposición del público.

Artículo 4.—Procedimiento para Tarifas Permanentes [,Temporeras] y de Emergencia.—

S[ó]lo podrán adoptarse tarifas de carácter temporero o de emergencia por un período de ciento ochenta (180) días o mientras prevalezcan las circunstancias que den lugar a la emergencia y en todo caso conforme a los procedimientos que se disponen a continuación:

(a) Cuando el cambio de tarifa sea temporero o se deba a una situación de emergencia, antes de la efectividad de las tarifas, se emitirá una notificación al público a través de los medios de comunicación, dando aviso del cambio o modificación de tarifas y explicando, en términos generales, las razones o situación de emergencia para tal determinación.

(b) En todo caso que se decrete un aumento temporero la instrumentalidad de que se trate deberá emitir un informe detallado explicativo de los fundamentos o circunstancias que dieron lugar a su decisión. Tal informe deberá ponerse a la disposición del público en un lugar accesible no más tarde de los diez (10) días previos a la fecha de comienzo de las vistas públicas que conforme esta ley se deben celebrar.

(c) Cuando se decrete un aumento temporero o de emergencia, se deberán comenzar a celebrar las vistas públicas para la consideración de dicho aumento o cambio, dentro de los treinta (30) días siguientes a la fecha de efectividad del mismo. De no comenzarse las vistas públicas dentro del término señalado, el aumento temporero o de emergencia quedará sin efecto ni validez alguna. En estos casos, la notificación de celebración de vistas públicas, la celebración de esas audiencias y la decisión del oficial examinador, estarán regidas por las disposiciones establecidas en el Artículo 3 de esta ley.

Artículo 5.—Revisión Legislativa de Tarifas.—

Toda determinación final de las entidades públicas sujetas a la aplicación de esta ley, luego de celebrarse las vistas públicas a que se refieren los Artículos 3 y 4 anteriores, respecto a cambios en tarifas podrá ser revisada por la Asamblea Legislativa mediante resolución concurrente o mediante resolución de cualquiera de sus Cuerpos. Nada de lo aquí dispuesto se entenderá limitativo de la facultad de los tribunales para revisar la decisión administrativa en los casos apropiados.

Artículo 6.—Excepciones.—

Los procedimientos sobre cambios de tarifas consignados en esta ley, no serán de aplicación a cambios que tenga que hacer la Autoridad por razón de ajustes tarifarios impuéstoles por agencias federales que reglamentan su área de operación o funcionamiento. En tales casos, la Autoridad notificará por escrito a sus abonados, a la fecha de aumentar la tarifa, que el cambio tarifario efectuado es el resultado de la aplicación de disposiciones reglamentarias procedentes de agencias federales.

Artículo 7.—Cláusula de Salvedad.—

Nada de lo aquí dispuesto impedirá que la Autoridad o cualquier instrumentalidad gubernamental análoga conceda a sus abonados o usuarios otros derechos más amplios que los prescritos anteriormente.

Artículo 8.—Vigencia.—

Esta ley comenzará a regir inmediatamente después de su aprobación y sus disposiciones serán de aplicación a los cambios o aumentos tarifarios que se anuncien a partir de su vigencia. Ley Núm. 21, *supra*, págs. 70–73.

## IV

El tribunal de instancia, en la sentencia que emitiera, determinó —respecto al aumento temporero decretado por la Autoridad el 31 de enero de 1986 al amparo del Art. 4 de la citada Ley Núm. 21— que la prueba desfilada lo que demostró fue que "se trataba desde un principio de un aumento

permanente [de] la tarifa";(3) y que "el resultado lógico [de lo anteriormente expresado] es que todo el procedimiento que se siguió de conformidad al Artículo 4 de la Ley Núm. 21 . . . es nulo [ab initio] por ser contrario a la ley. Siendo nulo el procedimiento no podía la Autoridad comenzar a cobrar las tarifas con el 44.76 por ciento desde el día 1 de febrero de 1986 hasta el 15 de abril de 1987". *Exhibit* 1, pág. 39.

Por otro lado, resolvió el foro de instancia que el aumento decretado el 31 de enero de 1986 no podía ser considerado como uno de emergencia —al amparo del referido Art. 4 de la Ley Núm. 21— por cuanto lo que la mencionada ley considera como una situación de emergencia lo es una "circunstancia imprevista" tal como un terremoto o huracán. A base de ello razonó que, como lo que la prueba aducida demostró fue que el fundamento para la actuación de la Autoridad lo era la crisis financiera que sufría y la misma no sólo era una "previsible" sino que producto de su propia "negligencia", ello "jamás" podía ser base o fundamento para aumentar las tarifas a través del procedimiento establecido por el Art. 4 de la citada Ley Núm. 21.

Por último, expresó el tribunal de instancia que aun asumiendo —a los fines de la argumentación— que la referida crisis financiera pudiera cualificar como fundamento para actuar bajo las disposiciones de un aumento de "emergencia" del Art. 4 de la Ley Núm. 21, la Autoridad venía en la obligación de así notificarlo a sus usuarios en el aviso de vistas públicas que publicó en relación con el aumento "temporero" que decretó el 31 de enero de 1986.(4)

---

(3) A esos efectos expresó dicho foro que "[l]a prueba más clara acreditativa de que dicho aumento no iba a ser temporero está en el hecho de que a los cinco (5) meses de haberse decretado el mismo, ya se había autorizado el inicio de los procedimientos para convertirlo en uno permanente". Véase la sentencia recurrida, págs. 35 y 36.

(4) Un examen del historial legislativo de la Ley Núm. 21 de 31 de mayo de 1985 (27 L.P.R.A. secs. 261–261e) claramente demuestra que la intención del legislador fue crear *dos* modalidades de aumento temporero, a saber: el aumento

En el recurso de revisión que radicara, la Autoridad "plantea" las siguientes "cuestiones" o interrogantes:

1. ¿Es aplicable a los hechos de este caso *la exención* provista por *el [A]rtículo 6* de la Ley 21?

2. ¿Se *limita* el concepto de *emergencia* que utiliza la Ley 21 a sucesos tales como terremotos y huracanes?

3. La dimensión o posible durabilidad de una emergencia, ¿obliga a la utilización del [A]rtículo 3 de la Ley 21 *como único recurso* para realizar ajustes tarifarios? (Énfasis suplido.)

A solicitud de la parte demandante-recurrida, celebramos vista oral el día 30 de noviembre de 1987. Estando en condiciones de resolver el recurso, procedemos a así hacerlo.(5)

## V

De entrada, disponemos del planteamiento de la Autoridad a los efectos de que su actuación al aumentar las tarifas está exenta de las disposiciones de los Arts. 3 y 4 de la Ley Núm. 21 en virtud de lo dispuesto en el Art. 6 de dicha ley. Rechazamos el mismo.(6)

■ Aparte del hecho de que dicha agencia nunca invocó la excepción del citado Art. 6 sino que, por el contrario, voluntariamente se sujetó al trámite de los Arts. 3 y 4 para validar el aumento que decretara y que, inclusive, no levantó dicha cuestión en la contestación a la demanda que radicara,

---

temporero propiamente y el aumento temporero debido a una situación de emergencia. Las partes así también lo entienden.

(5) Debe señalarse que el recurso de revisión fue radicado por la Autoridad ante este Tribunal el día 26 de junio de 1987. Inexplicablemente, dicha parte recurrente nunca radicó moción en auxilio de jurisdicción en solicitud de dispensa de términos reglamentarios y consideración preferente como así suele hacerse en casos que están revestidos de gran interés público.

(6) Según admite la propia Autoridad, el historial legislativo de la Ley Núm. 21 "no ofrece luz" sobre la referida disposición legal, lo cual viabiliza que interpretemos el mismo en armonía con el espíritu general de dicha ley.

el mismo es uno improcedente en derecho. Aceptar su planteamiento representaría la anulación total de la citada Ley Núm. 21 y la negación del propósito e intención legislativa, cual fue la de proteger a la ciudadanía puertorriqueña de actuaciones arbitrarias y caprichosas por parte de las corporaciones públicas a los que la referida ley se aplica.

En segundo lugar, en el presente caso no se trata de cambios tarifarios decretados por la Autoridad "por razón *de ajustes tarifarios impuéstoles* por agencias federales que reglamentan su área de operación o funcionamiento" (énfasis suplido) Ley Núm. 21, *supra*, Art. 6, pág. 73 —como, por ejemplo, en casos de compañías de teléfonos o compañías marítimas sujetas a tarifas interestatales— los cuales ni hay que justificar ni que cuantificar por cuanto el monto de los mismos es determinado por la agencia federal concernida.

Se trata, por el contrario, de un aumento de tarifa que se ve en la obligación de decretar la Autoridad, como consecuencia de una crítica situación financiera, producto la misma de diferentes problemas —entre los cuales se encuentran los requerimientos de la E.P.A. relativos a salud pública y para la concesión de fondos federales— que se vienen arrastrando y acumulando por años y que en un momento determinado hacen crisis, la razonabilidad y la cuantía de los cuales la Autoridad viene en la obligación de justificar. Existe una notable y clara diferencia entre ambas situaciones.

Por último, no podemos partir de la premisa de que el legislador actuó en forma contradictoria e inconsistente en relación con la Ley Núm. 21; esto es, por un lado imponiéndole una obligación a las corporaciones públicas, en protección del usuario, de seguir unos procedimientos en relación a aumentos de tarifas, y, por otro lado, eximiendo a dichas corporaciones sumariamente del cumplimiento con dichos procedimientos. Debe mantenerse presente que bajo los proce-

dimientos exigidos por los Arts. 3 y 4 de la Ley Núm. 21, le corresponde a la corporación pública el peso de probar, en las vistas públicas correspondientes, la necesidad del aumento tarifario. La adopción de la posición de la Autoridad de que, bajo los hechos del caso y en virtud de las disposiciones del Art. 6 de la ley, está exenta de los procedimientos requeridos por los citados Arts. 3 y 4 necesariamente conlleva que los usuarios, de interesar impugnar la tarifa que se decrete, tendrían que acudir a los tribunales donde le corresponderá a éstos, y no a la Autoridad, el peso de probar la improcedencia del aumento tarifario. Ello, como es de todos sabido, conlleva cuantiosos gastos en peritos, abogados, etc.; la exigencia de lo cual es no sólo irrazonable sino que absurda.

Sabido es que "la liberalidad en la interpretación [de la ley] no puede conducirnos ni a violentar la intención legislativa, ni a consagrar absurdos". *Rivera Coll* v. *Tribunal Superior*, 103 D.P.R. 325, 331 (1975); *Rojas* v. *Méndez & Co., Inc.*, 115 D.P.R. 50, 54 (1984).

## VI

Como hemos visto, la Ley Núm. 21 de 31 de mayo de 1985 tiene el loable propósito de impedir que las corporaciones públicas que cobija aumenten arbitraria y caprichosamente sus tarifas en perjuicio de sus usuarios. A esos efectos establece que el aumento de las tarifas únicamente será procedente mediante la utilización de dos métodos, a saber: el del aumento tarifario permanente, regulado el mismo por el Art. 3 de la ley, y el del aumento temporero o de emergencia, regulados éstos por las disposiciones del Art. 4 de dicha ley. La *diferencia básica* entre los dos métodos estriba en la fecha de vigencia del aumento en correlación con la celebración de las vistas públicas que para ambos métodos se provee. En el primero de ellos —el permanente— el aumento no

puede entrar en vigor hasta tanto se celebren las vistas públicas en que se demuestre la procedencia del mismo; en el segundo de ellos— el temporero o de emergencia— el aumento puede ser decretado de vigencia inmediata, debiendo ser celebradas las vistas públicas justificativas del mismo dentro del término de treinta (30) días de haberse puesto en vigor el mismo.

■ Nada hay en la citada Ley Núm. 21 que le prohíba a una corporación pública como la aquí en controversia, de entender ésta que se justifica la implantación de un aumento tarifario, que utilice, en primer lugar, las disposiciones del Art. 4 de dicha ley sobre aumentos temporeros o de emergencia y luego, de estimar que la situación por la cual atraviesa la agencia requiere o justifica que dicho aumento advenga permanente, el acudir a esos efectos a las disposiciones del Art. 3 de la ley sobre aumentos permanentes.

Resolver o sostener lo contrario, a nuestro juicio, representaría el maniatar innecesariamente, o meter dentro de una camisa de fuerza, a dichas corporaciones públicas. Aparte del posible daño y deterioro que podrían sufrir estas corporaciones, al verse privadas de obtener de inmediato dichos ingresos, probablemente representaría el obligar a las mismas a actuar irresponsablemente por cuanto de negárseles el acceso a ambas alternativas o métodos, vendrían obligadas a recurrir —con el consiguiente perjuicio para nuestros conciudadanos— al único camino disponible, el del aumento permanente, inclusive en situaciones en que no se justifica el mismo.

■ Resulta hasta cierto punto inmaterial, por lo tanto, el hecho de que unos directores de una corporación pública en particular —al enfrentarse a una situación en que el buen funcionamiento de la misma requiere un aumento tarifario— no obstante estar conscientes de que el aumento

debe ser de carácter permanente, originen el mismo a través de las disposiciones del Art. 4 de la ley siempre y cuando se cumpla con los requisitos tanto de dicha disposición legal como con las del Art. 3 de la referida ley. Lo que sí resulta ser contrario a las disposiciones de la Ley Núm. 21 —y que no permitiremos— lo es la *conversión automática* de un aumento temporero a uno de carácter permanente sin que se observen los requisitos exigidos por ambas disposiciones.

En resumen, concediendo —a los fines de la argumentación— que en el presente caso el aumento decretado el 31 de enero de 1986 tuviera visos de permanencia desde un principio, dicha circunstancia no impedía que, debido al estado de emergencia imperante en la Autoridad en esos momentos, se tomara acción inmediata a través de la implantación de un aumento temporero o de emergencia bajo las disposiciones del Art. 4, siempre y cuando posteriormente se observaran los procedimientos establecidos en el transcrito Art. 3 sobre aumentos permanentes, lo cual aquí se hizo. Los procedimientos establecidos en los Arts. 3 y 4 de la Ley Núm. 21, aunque separados, son complementarios. Véase *Joseph Horne Co.* v. *Pa. Public Utility Com'n*, 485 A.2d 1105 (Pa. 1984). No puede prevalecer, en su consecuencia, lo resuelto por el tribunal de instancia a los efectos de que por razón de que en el presente caso "se trataba desde un principio de un aumento permanente de la tarifa", resulta nulo "todo el procedimiento que se siguió de conformidad al Artículo 4 de la Ley Núm. 21".

Igualmente erróneo resulta ser el razonamiento del tribunal de instancia a los efectos de que el aumento decretado el 31 de enero de 1986 no puede ser considerado como uno de emergencia —bajo las disposiciones del citado Art. 4— por razón de que lo que la mencionada ley considera como una situación de emergencia lo es una "circunstancia

imprevista" tal como un terremoto o huracán y que la crisis financiera aducida como fundamento por la Autoridad para el aumento decretado "jamás" podría constituir base para el mismo por cuanto la misma no sólo era "previsible" sino el fruto de su "negligencia".

Debe quedar claro que en el presente caso no está en controversia el hecho de que la crítica situación financiera por la cual atravesaba la Autoridad, al momento de decretarse el aumento al amparo del Art. 4 de la Ley Núm. 21, era una real y extremadamente seria, producto la misma de una serie de problemas que hicieron crisis en ese momento. El récord así lo demuestra. *A esos efectos tenemos que el propio tribunal de instancia, a la pág. 8 de la sentencia que emitiera, expresa que el* "referido aumento obedeció al grave deterioro fiscal, operacional y administrativo sufrido por la Autoridad en los últimos años".

■ Respecto al punto de qué debe ser considerado como una situación de emergencia bajo las disposiciones de la Ley Núm. 21, coincidimos con la parte recurrente a los efectos de que en el contexto operacional de una corporación pública, dicho concepto debe ser de mayor amplitud que el estimado por el tribunal de instancia. En ese sentido, y en este aspecto, resulta de ayuda la opinión emitida por el señor Secretario de Justicia el día 29 de mayo de 1986.[7] En lo pertinente, se expresa en la misma que:

El término o concepto de emergencia, queda casi siempre enmarcado o asociado con desastres o situaciones causadas por fenómenos naturales, tales como huracanes, tormentas, inundaciones y otros, según por ejemplo dicho término se define en la Ley Número 22 de 23 de junio de 1976, según en-

_____

[7] Como es sabido, las opiniones legales que emite un Secretario de Justicia (*Attorney General*) no obligan a los tribunales. Véanse: *Jones* v. *Williams*, 45 S.W.2d 130, 131 (1931); *Harris County Comm'rs Court* v. *Moore*, 420 U.S. 77, 87 n. 10 (1975).

mendada, conocida como "Ley de la Defensa Civil de Puerto Rico", 25 L.P.R.A. secs. 171 *et seq.*, en específico el apartado (b) de su Artículo 3, 25 L.P.R.A. sec. 171b(b).

Sin embargo, ese no es necesariamente su significado ni tampoco su principal matiz, sino que el mismo realmente comprende un suceso o combinación de circunstancias que exigen inmediata actuación, según la definición utilizada por el Tribunal Supremo de Puerto Rico en el caso de *Ramos* v. *La Unión Local de Panaderos*, 32 [D.P.R.] 321 (1923). Definición o significado que nos impone la obligación de atemperar la misma a la naturaleza de la actividad o situación de que se trate, en nuestro caso el aumento tarifario por servicios públicos esenciales.

En lo que toca a la situación particular que nos ocupa, no hemos encontrado en nuestra jurisdicción ningún estatuto o reglamento, así como tampoco ninguna interpretación jurisprudencial que nos defina o d[é] alguna luz en cuanto al alcance del significado del término emergencia, según relacionado con tarifas por servicios públicos.

Sin embargo, en lo que corresponde a la naturaleza de dicho concepto, se señalan y proveen en la casuística norteamericana, según resumidas en el caso de *Potomac Elec. Power* v. *Public Service Com[m]ission of Dist. of Col.*, 457 A.2d 776 (D.C. App., 1983), las siguientes guías:

"The Commission has consistently articulated three sets of circumstances which may serve as a basis for granting emergency rate relief. These circumstances, which comport with emergency ratemaking criteria may be summarized as follows:

(1) a present or clearly imminent threat that the Company will be unable to continue meeting its public service obligation;

(2) a present or clearly imminent threat that the Company will be unable to obtain necessary capital funds to finance the construction of necessary new or replacement plant;

(3) the Company is experiencing earnings which produce a rate of return substantially less than that which is reasonable." *Potomac Elec. Power* [v. *Public Service Commission of Dist. of Col.*], 457 A.2d a las págs. 784–785.

En lo que a dichos requisitos respecta, y en particular el tercero de ellos en cuanto a la tasa de rendimiento, se señala en el Estado de Ohio que "[t]he central issue in an emergency case, on the other hand, is not rate of return, but how to protect the applicant from the injurious effects of its particular financial circumstances, so that its ability to provide adequate service will not be impaired["]. S. Bloomfield, "Emergency Rate Ma[k]ing for Ohio Public Utilities". 37 Ohio St. L.J. 108 (1976), a la pág. 117. Véase también *Detroit Edison Co.* v. *Public Service Commission*, 342 N.W.2d 273, 279 (Mich., 1983); *Application of Hawaii Elec. Light Co., Inc.*, 594 P.2d 612, 621 (Hawaii, 1979). Lo que en nuestro caso debe tomarse en cuenta, máxime cuando las empresas que nos ocupan, no son sino corporaciones públicas.

De otro lado, como razones para conceder y permitir un aumento tarifario se han señalado como circunstancias extraordinarias o de emergencia, situaciones tales como evitar una reducción en los programas de mantenimiento de las compañía[s] de servicio público, evitar una reducción sustancial en la nómina o número de personas empleadas, así como también, mantener la estabilidad financiera de la compañía de forma tal que pueda continuar brindando sus servicios. *Joseph Horne Co.* v. *Pennsylvania P.U.C.*, 485 A.2d 1105, 1110 (Pa. 1984).

En cuanto al caso específico de mantener la estabilidad de la situación financiera de ese tipo.de compañía, y en particular lo relativo a sus obligaciones fiscales o deudas, se ha resuelto que "[t]he fact that a utility is unable to arrange necessary debt financing at reasonable rates without improved revenues manifestly could be a condition warranting the grant of interi[m] rate relief." *Kansas-Nebraska Nat. G. Co., Inc.* v. *State Corp. Com'n*, 538 P.2d 702, 711 (Kan., 1975).

De conformidad con lo antes expresado resulta menester concluir, que la imposibilidad de poder cumplir obligaciones de naturaleza tanto legales como financiera[s] quedan claramente contenidas dentro de los conceptos de emergencia y aumento temporero contemplados en la Ley Núm. 21. *Exhibit* 18, págs. 9–10.

Como vemos, el concepto "emergencia" no necesariamente se limita a una circunstancia imprevista, sino

que comprende un suceso o combinación y acumulación de circunstancias *que exigen inmediata actuación*. "Emergencia" es sinónimo de "urgencia", "necesidad", "prisa". A. López, *Diccionario de sinónimos y antónimos de la lengua española*, Valencia, Ed. A. Ortells, 1985, pág. 390. Serían aplicables al caso de autos dos de los criterios establecidos en el caso *Potomac Elec. Power* v. *Public Service Commission of Dist. of Col.*, 457 A.2d 776 (D.C. App. 1983), citado en la Opinión del Secretario de Justicia; a saber: (1) una amenaza actual o claramente inminente de que la Agencia será incapaz de continuar llevando a cabo su gestión de servicio público, y (2) una amenaza actual o claramente inminente de que la Agencia será incapaz de obtener fondos necesarios para financiar la construcción de plantas nuevas o de reemplazo necesarias.

▮ Nos parece que las razones esgrimidas por la Autoridad en su Resolución 1198, mediante la cual decreta el aumento temporero aquí cuestionado, así como la vasta evidencia que la respalda, presentan un cuadro lo suficientemente claro de una crisis de tipo operacional y financiera de la Autoridad que requería acción inmediata y por tanto constituía una "emergencia" a la luz de las disposiciones del Art. 4 de la Ley Núm. 21.

▮ La determinación sobre la existencia de una emergencia en esta clase de casos debe ser realizada independientemente de quién la causó y cuándo se causó la misma. La única cuestión a determinar es si dicha crisis es una real y verdadera. Sobre ello, no tenemos duda en el presente caso.

Resolvió, en adición, el tribunal de instancia, que el aumento decretado por la Autoridad el 31 de enero de 1986 no puede considerarse como uno de emergencia porque se le denominó "temporero". Basó el tribunal su conclusión en lo siguiente:

Al notificársele al público que el aumento tarifario decretado era uno temporero la motivación que pudieran tener las personas interesadas para acudir a las vistas públicas no iba a ser la misma, si por el contrario la notificación hubiera sido avisando un aumento de *emergencia* cuya vigencia no está limitada a ciento ochenta (180) días. (Énfasis en el original.) *Exhibit* 1 de esta solicitud, Apéndice, pág. 46.

▬▬▬▬ En primer lugar, si bien es cierto que en la Resolución 1198 publicada en la prensa se calificó el aumento como uno "temporero", en ella se hace referencia a las circunstancias de emergencia que lo motivaron.[8] Por lo tanto, el público quedó debidamente informado de que se trataba de un aumento de emergencia. Debe mantenerse presente que el "nombre no hace la cosa". *Comisión de Servicio Público* v. *Tribl. Superior*, 78 D.P.R. 239, 246 (1955). En segundo lugar, ambos términos son, aun cuando contemplan situaciones diferentes, hasta cierto punto intercambiables bajo las disposiciones de la Ley Núm. 21. Prueba de esto es que se establece un solo procedimiento para aumentos temporeros y de emergencia (Art. 4), con la única salvedad de que "podrán adoptarse tarifas de carácter temporero o de emergencia por un período de ciento ochenta (180) días o mientras prevalezcan las circunstancias que den lugar a la emergencia". Como hemos visto, ambas modalidades tienen en común que no son de vigencia permanente.

En adición, el inciso (a) del Art. 4 de la Ley Núm. 21, al hacer referencia al aviso del cambio temporero o debido a

---

[8] Incluso se hace alusión a la "implantación de un plan de emergencia" en su 8vo "por cuanto", y "medidas de emergencia" en sus 9no y 10mo "por cuantos". Se utilizaron además expresiones tales como "grave deterioro fiscal, operacional y administrativo", "urgente necesidad de implantar un programa de construcción", "de no corregirse inmediatamente l[o]s fall[o]s en 47 plantas", "se pondría en peligro la salud del pueblo de Puerto Rico", "grave responsabilidad de garantizar el desenvolvimiento normal de esta Agencia", "para la implementación inmediata del aumento temporero". *Exhibit* 11 y 12, Apéndice, págs. 152–159.

una situación de emergencia, dispone que dicho aviso explicará, "en términos generales, *las razones o situación de emergencia para tal determinación*". (Énfasis suplido.) Esto fue exactamente lo que hizo en el presente caso la Autoridad demandada. En su consecuencia, la calificación del aumento como "temporero" no tenía por qué afectar la participación de las personas interesadas en las vistas públicas como incorrectamente aseverara el foro de instancia.

Nos resta por considerar si el aumento tarifario decretado por la Autoridad el 31 de enero de 1986, efectivo el mismo el día 1ro de febrero de ese mismo año, cesaba a los ciento ochenta días de su fecha de vigencia o, por el contrario, podía continuar vigente —como de hecho estuvo— hasta la fecha en que se decretara, y fuera efectivo, el aumento permanente.

El Art. 4 de la transcrita Ley Núm. 21, en lo pertinente, dispone:

> Sólo podrán adoptarse tarifas de carácter temporero o de emergencia por un período de ciento ochenta (180) días *o mientras prevalezcan las circunstancias que den lugar a la emergencia* . . . . (Énfasis suplido.) 27 L.P.R.A. sec. 261c.

Como podemos notar, la letra de la ley es clara en lo referente a la duración de las dos modalidades de aumento temporero. Bajo la primera alternativa —el del aumento "temporero" propiamente— el mismo estará en vigor por un término de ciento ochenta (180) días; bajo la segunda —aumento temporero decretado debido a una situación de emergencia— el aumento podrá estar vigente "mientras prevalezcan las circunstancias que den lugar a la emergencia". No hay necesidad alguna, por tanto, de acudir al historial legislativo de dicha medida bajo el pretexto de "cumplir su espíritu" y estar en condiciones de interpretarla. Véase el Art. 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14. Véanse, en adición, *Febo Ortega* v. *Tribunal Superior*, 102 D.P.R. 405

(1974); *Román* v. *Superintendente de la Policía*, 93 D.P.R. 685 (1966).

 Resolvemos, en su consecuencia, que cuando una corporación pública, cubierta por las disposiciones de la citada Ley Núm. 21, decreta un aumento tarifario temporero, *basado el mismo en una situación de emergencia*, dicha tarifa temporera podrá estar en vigor mientras prevalezcan las circunstancias o causas de la emergencia, aun cuando ello exceda del término de ciento ochenta (180) días. Resolver lo contrario, a nuestro juicio, significaría el ignorar las expresas disposiciones del estatuto en cuestión.

 Nada de lo anteriormente expresado, sin embargo, significa que una corporación pública podrá mantener en vigor, por un período de tiempo irrazonablemente largo, un aumento tarifario temporero decretado como consecuencia de una emergencia. De poderse razonablemente prever, una vez decretado el aumento de emergencia, que la misma pueda extenderse por un término relativamente largo en exceso de los primeros ciento ochenta (180) días, la agencia vendrá en la obligación de acudir —*dentro del referido término de ciento ochenta (180) días*[9]— al procedimiento establecido bajo el Art. 3 de la Ley Núm. 21, esto es, al procedimiento para establecer un aumento permanente.

Como expresáramos anteriormente, en el presente caso, aun cuando la Autoridad denominó el aumento que decretara el 31 de enero de 1986 como uno "temporero", el mismo fue así decretado debido a la emergencia que sufría la agencia

---

[9] Entendemos procedente exigir que —salvo en casos extraordinarios— el procedimiento bajo el Art. 3 de la Ley Núm. 21 comience *dentro* del término de los primeros 180 días, por razón de estimar que dicho período de tiempo es uno suficiente para que la agencia pueda determinar la duración o extensión de la emergencia y, por ende, la necesidad de mantener o no el aumento resultante de la misma.

como consecuencia de su crítica situación financiera, lo cual claramente surgía de la resolución emitida por la Autoridad, que fuera notificada al público consumidor. Siendo ello así y habiendo la Autoridad comenzado el trámite para el aumento permanente dentro del término de los ciento ochenta (180) días —mediante la resolución de fecha 27 de junio de 1986 en que ratificó la existencia del estado de emergencia y ordenó el comienzo del procedimiento bajo el Art. 3 de la Ley Núm. 21— resolvemos que dicho aumento podía válidamente continuar en vigor hasta la fecha de vigencia del aumento permanente, esto es, hasta el 15 de abril de 1987.[10]

Por las razones antes expresadas, *se dictará sentencia revocatoria de la dictada el 12 de junio de 1987 por el Tribunal Superior de Puerto Rico, Sala de San Juan, en el Caso Civil Núm. PE-87-396 (904) en cuanto ésta anuló el aumento decretado por la Autoridad de Acueductos.*[11] *Ello,*

---

[10] Nos preocupa sobremanera que en el presente caso el oficial examinador independiente que fuera designado por la Autoridad para presidir las vistas públicas relativas al aumento tarifario permanente no rindiera su informe dentro del término de sesenta (60) días que se establece en el inciso (d) del Art. 3 de la Ley Núm. 21.

El cumplimiento estricto con el referido término por los oficiales examinadores que a esos efectos sean designados definitivamente ayuda a la pronta solución de esta clase de situaciones, ello en beneficio del consumidor.

El mencionado término de sesenta (60) días únicamente podrá ser prorrogado por la corporación pública a solicitud escrita y fundada presentada por el oficial examinador, dentro del referido término de sesenta (60) días, en la cual éste justifique la imposibilidad de cumplir con el mismo.

Quedan apercibidas las corporaciones públicas de que en lo sucesivo exigiremos, como principio de sana administración pública, el cumplimiento estricto de los términos establecidos por el Art. 3 de la citada Ley Núm. 21. Así no lo hemos hecho en el presente caso en vista de que la ley expresamente no lo exige y por constituir ésta una interpretación —la primera— que de dicha ley hace el Tribunal.

[11] Valga aclarar que *no emitimos juicio alguno* sobre si el aumento del 44.76% que decretara la Autoridad de Acueductos y Alcantarillados, vigente el mismo en forma permanente desde el 15 de abril de 1987, *es uno justo y razonable* por razón de que ello no fue impugnado por la parte demandante en la demanda que radicara originalmente ante el tribunal de instancia. En la misma,

*naturalmente, hace innecesario que resolvamos el planteamiento sobre honorarios levantado en el recurso RE-87-375, anulándose el auto expedido en el mismo.*

El Juez Asociado Señor Negrón García concurre en el resultado con opinión escrita. El Juez Asociado Señor Hernández Denton se inhibió.

—O—

Opinión concurrente del Juez Asociado Señor Negrón García.

A modo de introito procede la siguiente observación. La función judicial de juzgar, por naturaleza es intrínsecamente delicada. Se torna más compleja cuando inevitablemente versa sobre asuntos volátiles y de reconocido interés público —como el de autos— que son objeto natural de destaque y comentarios en los medios noticiosos del país. Ello es comprensible y normal. Lo que sí resulta objetable y dañino —aunque forme parte del derecho a la libre expresión— son los señalamientos diarios, a título de recordatorio, por algunos funcionarios públicos de alto rango directivo de la Autoridad de Acueductos y Alcantarillados (Autoridad), que claman por la pronta solución de este recurso, sin que tal pedido se haya canalizado apropiadamente vía los procedimientos judiciales disponibles. Sencillamente, esas instancias prominentes —individuales y a coro— hacen más difícil el descargo de nuestra misión y propicia la incomprensión y malos entendidos en cuanto a nuestro insoslayable deber de adjudicar con ecuanimidad, libres de toda "influencias de personas, grupos o partidos, o de ser influido por el clamor público, por consideraciones de popularidad o notoriedad, o

---

dicha parte se limitó a impugnar *el procedimiento* que siguiera la Autoridad para establecer dicho aumento.

por motivaciones impropias". Canon XI de Ética Judicial, 4 L.P.R.A. Ap. IV-A, *in fine.*

"El que reconozcamos el derecho de expresión y el de la crítica, no significa que estemos ajenos [e insensibles]. . . . En modo alguno nos han impedido juzgar serena y objetivamente los méritos de[l] recurso." *Imp. Vilca, Inc.* v. *Hogares Crea, Inc.*, 118 D.P.R. 679, 681 (1987).

Hechas estas salvedades, adjudiquemos.

I

Por razones distintas, coincidimos con el resultado a que arriba el Tribunal que revoca la sentencia del Tribunal Superior, Sala de San Juan, que anuló el aumento tarifario decretado el 31 de enero de 1986 por la Autoridad. El récord administrativo palmariamente refleja la existencia de una verdadera deficiencia fiscal que convulsionó los cimientos de su estabilidad, producto de un sinnúmero de factores que se acumularon durante varios años.

Ante este fenómeno, creemos importante puntualizar que ese deterioro económico cobró verdaderas dimensiones de crisis y desplome institucional, y alcanzó su momento culminante, con la intervención y reglamentación al máximo de la Agencia de Protección Ambiental federal (*Environmental Protection Agency*), conocida como la E.P.A., sus instancias y órdenes judiciales obtenidas —cuya razonabilidad no es de nuestra incumbencia— de la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico, en los casos de *United States* v. *Puerto Rico Aqueduct and Sewer Authority*, 78-0038 y 83-0105. Tan es así, que al aprobarse el aumento tarifario, la Junta de Directores de la Autoridad —sin excluir la realización de otras gestiones tendentes a obtener fuentes alternas de financiamiento— se vio compelida a asignar exclusivamente toda cantidad recaudada mediante dicho incremento a la construcción, mantenimiento y reparación de su obra permanente, *en observancia de los requerimientos de solvencia y reajustes tarifarios previstos en la*

*Ley Federal de Aguas Limpias*, 33 U.S.C. sec. 1251 *et seq.*, y reglamentación de la E.P.A.(¹)

El informe del Comité Examinador, al resumir la ponencia del Director de la E.P.A. en la Oficina del Caribe, Sr. Pedro Gelabert —durante las vistas públicas— expone así los efectos y resultados de la intervención de esa agencia federal, sobre la Autoridad, incluyendo sus tarifas:

> . . . tiene un efecto dual en los aspectos administrativos, financieros y operacionales de la Autoridad, a saber: *como instrumentalidad reguladora* y como agencia proveedora de fondos.
>
> 2. La función fiscalizadora de la Agencia Federal para la Protección del Ambiente se hace sentir más firme desde que en 1972 se aprueba la Ley de Agua Limpia ("Clean Water Act"). Dicha ley, entre otras cosas, impone unos requisitos en cuanto al tratamiento y disposición de aguas usadas, unos parámetros de pureza en el tratamiento y calidad del agua para

---

(¹) Esta ley federal faculta al Administrador de la E.P.A. a requerir de las instituciones solicitantes de fondos, como la Autoridad, la adopción de un sistema de cargos que asegure proporcionalmente el pago por parte de cada recipiente de los servicios de tratamientos de aguas usadas. 33 U.S.C. sec. 1284(b)(1).

Con mayor particularidad, la reglamentación de la E.P.A., en lo pertinente, requiere que la Autoridad, como beneficiaria de fondos federales, establezca en su presupuesto los costos operacionales y de mantenimiento. Bajo este esquema regulatorio, la Autoridad "*debe* revisar, *por lo menos cada dos años*, la cuota correspondiente a los usuarios o clases de usuarios sobre tratamiento y disposición de aguas usadas, los costos totales de operación y mantenimiento, y su sistema de cargos. *Debe* revisar los cargos a los usuarios o clases de usuarios para lograr lo siguiente: (1) mantener una distribución proporcional de costos operacionales y de mantenimiento entre sus usuarios y clases de usuarios según aquí requerido; (2) generar suficientes ingresos para pagar los costos totales de operación y mantenimiento necesarios para la operación y mantenimiento adecuados (incluso reemplazos) de los trabajos de tratamiento, y (3) aplicar el exceso de ingresos cobrados de una clase de usuarios al costo de operaciones y mantenimiento atribuible a la clase, y de conformidad, *ajustar la tarifa para el próximo año*". (Traducción nuestra y énfasis suplido.) 40 C.F.R. sec. 35.929.2(b) (1987).

La inclusión de estas obligaciones muchas veces es una condición preexistente para el recibo de ayuda federal. Estos deberes se han caracterizado judicialmente como "enteramente criatura del estatuto y de la reglamentación federal". *U. Merchants Mfrs.* v. *Aiken County Pub. Ser. Auth.*, 766 F.2d 151, 154 (1985); *Middlesex Cty. Utilities Auth.* v. *Bor. of Sayreville*, 690 F.2d 358, 364–365 (1982).

consumo humano y *también establece ciertos requerimientos en cuanto al mantenimiento de tarifas equitativas por el uso de los sistemas de alcantarillado sanitario.* (Énfasis suplido.) Apéndice, pág. 327.

Por vía de ilustración, entre los antecedentes que el informe destacó, se consigna que el señor Gelabert explicó cómo durante la última década, el Gobierno federal, a través de la E.P.A. —de conformidad con la Ley de Aguas Limpias— había aportado más de $400,000,000 para el programa de alcantarillado sanitario y la construcción de plantas de tratamiento de aguas. Esta cantidad fue pareada con una aportación local de $100,000,000. Apéndice, págs. 328–329. El costo del programa de mejoras permanentes para el sistema de alcantarillado sanitario —imprescindible para cumplir con los requisitos federales de tratamiento y disposición de aguas usadas— ascendía aproximadamente a $600,000,000, suma de la cual el 55% sería provisto por la E.P.A. y el restante 45%, por aportaciones locales. Íd., págs. 329–330. Bajo el historial habido desde la aprobación de la Ley de Aguas Limpias hasta el 5 de marzo de 1986, enfatizó la situación crítica de incumplimiento por la Autoridad de las normas federales en 93 plantas de tratamiento de aguas. Ello motivó la presentación del caso ante la corte federal y el arresto de 49 de dichas plantas. Expuso, según su criterio, que se necesitaban $80,000,000 para resolver el problema inmediato de las facilidades arrestadas. Íd., pags. 330–331.

Finalmente, aludió a la ingerencia *directa* de la E.P.A. en los asuntos tarifarios de la Autoridad. Sobre el particular, el informe indica que el señor Gelabert atestó que la aportación de fondos federales —según la legislación federal— exigía que "las tarifas produzcan rentas suficientes para cubrir los gastos de operación, mantenimiento y re[e]mplazo de la planta en servicio". Apéndice, pág. 328. Coincidió en que la situación de la Autoridad era "una de emergencia donde la

salud del pueblo está en juego". Endosó totalmente el aumento tarifario propuesto. Íd., pág. 332.

En síntesis, a la luz del resumen contenido en este informe del testimonio del señor. Gelabert, y demás evidencia, es indudable la relación *directa* entre las disposiciones pertinentes de la Ley Federal de Aguas Limpias y la reglamentación de la E.P.A., respecto a los requisitos tarifarios, y lógicamente, el aumento decretado. *La adopción mandatoria de un sistema tarifario equitativo bienal es la contrapartida de esa ayuda federal.* Su revisión mandatoria es un imperativo federal, aun cuando la Autoridad pudiera tener otras fuentes de ingreso para asegurar la adecuada operación y el buen mantenimiento de sus facilidades de tratamiento de aguas. R.E. Beck y C.P. Goplerud III, *Waters & Water Rights, A Treatise on the Law of Waters and Allied Problems*, 2da ed., Indiana, The Allen Smith Company, 1984, Vol. 3, Sec. 205.4.

## II

Esta conclusión, a la luz de los hechos no contradichos, nos mueven a examinar separadamente lo dispuesto en el Art. 6 de la Ley Núm. 21 de 31 de mayo de 1985 (27 L.P.R.A. sec. 261e). Lo hacemos, pues este Tribunal, haciéndose eco del tribunal de instancia, decide que el planteamiento al respecto de la Autoridad es improcedente. Discrepamos de ese enfoque. En la medida en que la opinión interpreta amplia y liberalmente los términos de la ley, con igual espíritu deberíamos evaluar el alcance de esta peculiar disposición. Después de todo, la ausencia de una interpretación previa, el riesgo que ese vacío de precedente representaba y la oportunidad de conceder la más amplia participación ciudadana, fue lo que movió a la Autoridad a enfrascarse en todo el complicado y costoso trámite de aumentos de tarifa, según los términos de los Arts. 3 y 4 de la ley, 27 L.P.R.A. secs. 261b y

261c —que si bien hoy llega a su fin— mañana puede repetirse.

El Art. 6 de la ley dispone:

*Excepciones*

Los *procedimientos* sobre cambios de tarifas consignados en esta ley, *no serán de aplicación a cambios que tenga que hacer la Autoridad por razón de ajustes tarifarios impuéstoles por agencias federales que reglamentan su área de operación o funcionamiento.* En tales casos, la Autoridad notificará por escrito a sus abonados, a la fecha de aumentar la tarifa, *que el cambio tarifario efectuado es el resultado de la aplicación de disposiciones reglamentarias procedentes de agencias federales.* (Énfasis suplido.)

No obstante los términos de esta excepción, el tribunal a quo descartó su aplicabilidad. Fundamentó su apreciación en que el "r[é]cord administrativo está huérfano de prueba que acredite el hecho de que alguna agencia federal *le haya requerido o impuesto* a la Autoridad algún ajuste tarifario. *El r[é]cord no demuestra que la EPA le haya exigido a la Autoridad que aumente sus tarifas por los servicios que presta al público.* Lo que sí le ha exigido la EPA a la Autoridad es el cumplimiento con la Ley Federal de Aguas Limpias . . .". (Énfasis suplido.) Apéndice, pág. 52.

En términos fácticos y jurídicos, la interpretación es literal y restrictivamente errónea. Es principio de hermenéutica que, bajo pretexto de buscar la intención legislativa, un tribunal no está autorizado a adicionarle limitaciones que no aparecen en un estatuto. *Román* v. *Superintendente de la Policía,* 93 D.P.R. 685, 686 (1966). Como expusiéramos antes, la Autoridad demostró que el cambio tarifario se debió *principal y sustancialmente* a la necesidad de cumplir con la reglamentación federal aplicable. Así lo consignó en su Resolución de 31 de enero de 1986. Ello nadie lo cuestiona. Incluso el foro de instancia concluyó:

Del r[é]cord administrativo surge que *la verdadera causa de la crisis por la que atraviesa la Autoridad es su reiterado incumplimiento con la Ley Federal de Aguas Limpias,* lo que motivó que la EPA radicara una demanda en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico contra la Autoridad allá para el 1978, para que se obligara a cumplir con la Ley. *Civil 78–38cc.*

*El 27 de febrero de 1978 se obtuvo la primera orden judicial por consentimiento.* El incumplimiento de esa orden por la Autoridad forzó a la E.P.A. a buscar revisiones a la misma y al nombramiento de un "monitor" del Tribunal para vigilar el trabajo de la Autoridad, o sea, velar por el cumplimiento de la Sentencia, *Civil 83–105cc.*

En el año 1985 la E.P.A. y el Departamento de Justicia Federal volvieron al Tribunal ante el incumplimiento de la Autoridad a lo que voluntariamente se obligó, y obtuvieron otra orden que se expidió en febrero de 1985.

En el 1986 la E.P.A. y el Departamento de Justicia Federal acuden nuevamente al Tribunal ante el incumplimiento de la Autoridad a la orden dictada por el Tribunal en febrero de 1985 y se expidió el 11 de marzo de 1986 una orden interina contra la Autoridad.

En el 1978 se le impuso a la Autoridad una multa de $10,000.00; en el 1985 le fue impuesta otra multa de $100,000.00 y tan reciente como el día 4 de mayo de 1987, *se le impuso una de 33 millones de dólares (esta última se encuentra pendiente).* (Énfasis suplido.) Apéndice, págs. 40–41.

Ante estas circunstancias, ¿cobra vigencia la excepción enunciada en el Art. 6? Somos conscientes de que hay una ausencia total en el legajo legislativo sobre qué razones inspiraron, aparentemente a última hora, su redacción. Ello dificulta pero no imposibilita su interpretación para lograr detectar y precisar el propósito y espíritu sumergido en sus palabras. Veamos. Como ayuda extrínseca sabemos que al momento de incorporar esta excepción, el legislador conocía la importancia, alcance e ímpetu que había generado la intervención y reglamentación federal. Ya para los años 1981 y 1982 se había hecho otros aumentos tarifarios "para cumplir

con la legislación y reglamentación federal". Apéndice, pág. 312. Se sabía de las órdenes emitidas en el pleito presentado por la E.P.A. en la corte federal. La cuestión era pública. Además, había sido objeto de preocupación, señalamiento y comunicación a la Asamblea Legislativa por el Gobernador de Puerto Rico, Hon. Rafael Hernández Colón, en su Primer Mensaje el 14 de febrero de 1985. En esa ocasión —sobre la situación administrativa entre varias agencias— mencionó a la Autoridad, y subsiguientemente advirtió que "por primera vez en nuestra historia, el Gobierno Federal ha tenido que exigir *cuentas inmediatas y plantear posibles penalidades o reembolsos*". (Énfasis suplido.) Mensaje del Gobernador, *supra*, pág. 8.

Esta expresión así aislada hay que enlazarla con su Segundo Mensaje el 3 de febrero de 1986. En éste, frontalmente y bajo el tópico de "Plantas de Tratamiento de Acueductos", comenzó una exposición detallada diciendo: "Ocho días tras el [Primer] mensaje, la Corte Federal ordenó el arresto de 42 plantas de tratamiento de aguas basándose en una estipulación acordada en diciembre de 1984, entre la Autoridad de Acueductos y la Agencia Federal de Protección Ambiental. . . . A pesar de que en 1978 se aumentaron las tarifas de Acueductos en 19%, que en 1981 se volvieron a aumentar esta vez en 51.6%, y en 1982 se hizo un tercer aumento de 37.8 se nos entregó la Autoridad el 2 de enero del 85 sin recursos suficientes para poder financiar el costo de reparación y construcción de nuevas plantas necesario para cumplir con la estipulación que se había firmado en diciembre de 1984 en la Corte Federal."

En un análisis retrospectivo, este trasfondo cronológico nos suministra datos vitales para desentrañar cuál fue la verdadera intención legislativa, pues poco tiempo después del Primer Mensaje del Ejecutivo, se aprobó la Ley Núm. 21 (27 L.P.R.A. sec. 261 *et seq.*). Frente a este escenario, cabe re-

cordar que el "legislador, aun con su experiencia y extensa visión del conjunto de los principios jurídicos y del complejo de las relaciones sociales, aun sabedor de las necesidades sociales de su pueblo, *no puede comprender en su Ley, para regularlos, todos los casos y problemas que puedan presentarse en la vida.* De un lado, *su atención recae sobre los hechos y casos más importantes y frecuentes que suelen presentarse, y con ello no agota las posibilidades ni regula, por tanto, ni tiene en cuenta las variadísimas circunstancias en que pueden presentarse".* (Énfasis suplido.) M. Novaldos y Pérez-Acevedo, *Las Lagunas Jurídicas,* 1980 Rev. Der. Privado 637, 638 (enero–junio de 1980).

Bajo esta visión, es perfectamente entendible la razón de ser y el alcance de la excepción del Art. 6. La Asamblea Legislativa no podía anticipar el resultado final de la intervención y reglamentación de la E.P.A. y su impacto tarifario. Tampoco el desenlace final de los pleitos en el foro federal. Ante esa incertidumbre y para cubrir posibles nuevas contingencias la voluntad legislativa concibió en términos amplios la excepción del Art. 6 que recoge y reconcilia esos intereses en colisión.

Para su aplicabilidad no era menester demostrar si la Autoridad había sido diligente o incurrido en mora al acatar la reglamentación federal. Bastaba la concurrencia de las circunstancias apuntadas en el Art. 6, a saber, que los aumentos fueran "por razón de ajustes tarifarios impuéstoles por agencias federales", o "el resultado de la aplicación de disposiciones reglamentarias procedentes de agencias federales". Este lenguaje estatutario no significa ni se limita —como equivocadamente se estima— a que la reglamentación sea impuesta formal y directamente por la agencia federal concernida, en este caso la E.P.A. En esa situación obviamente no se debate que la excepción opera claramente.

La cobertura del Art. 6 es mucho mayor. En materia de hermenéutica estatutaria podemos entender el significado literal de las palabras y no comprender el sentido espiritual total de una frase. En su esencia, la excepción no sólo se activa por intervenciones directas en las tarifas con una agencia por el Gobierno federal, sino en virtud de aquellos reajustes mandatorios, aunque sean indirectos, resultantes de esa intervención.

Reconocemos que la Ley Núm. 21 crea unos importantes mecanismos procesales en protección de los consumidores. En derecho administrativo, los valores en que se apuntala ese trámite, son igual trato para situaciones similares, responsabilidad de los administradores al público consumidor, participación ciudadana, predecibilidad y eficiencia. Nota, *Regulatory Values and the Exceptions Process*, 93(5) Yale L.J. 938, 944–951 (1984). No debemos anularlos mediante interpretaciones laxas. Pero también hemos de tener presente que la Ley Núm. 21, como estatuto innovador, está diseñada para afrontar múltiples situaciones. No pasamos, pues, por alto que, en un deseo de tutelar al máximo a los consumidores, se aduzca que esta interpretación implica concederle a la Autoridad poderes no visualizados y exagerados, y una escapatoria fácil para prescindir de los trámites de la ley y aumentar arbitrariamente las tarifas en detrimento de sus abonados.

Aunque admitimos los méritos de esa preocupación, no coincidimos con la misma. Nuestra interpretación no es contraria al espíritu total de la ley. Al invocarse el Art. 6, los consumidores no quedan en estado de indefensión. Primeramente, la Autoridad viene obligada a notificar por escrito y explicar a sus abonados la necesidad del cambio tarifario y que responde a reglamentación federal. Segundo, bajo el supuesto de actuar arbitrariamente la Autoridad y no poder explicar y demostrar satisfactoriamente que el aumento tari-

fario es consecuencia directa o indirecta de la reglamenta-
ción federal, el mismo podría ser impugnado y anulado en los
tribunales. Y tercero, como secuela, ante esa eventualidad y
conforme el esquema que late en esta pieza legislativa, por
ser una excepción, el *onus probandi* correspondería a la Au-
toridad.

En definitiva, el estatuto simplemente dota a las autori-
dades que proveen servicios indispensables públicos, a prio-
ri, de la flexibilidad necesaria para remediar económi-
camente ciertas situaciones temporales y de emergencia. Sin
embargo, no son exclusivas ni excluyentes. El Art. 6 dispone
*otro* mecanismo para afrontar situaciones creadas por la di-
námica —a veces armoniosas y otras tensas— existente en-
tre el Gobierno federal y el Estado Libre Asociado en
distintas áreas. Es la fórmula tripartita conciliadora y ecléc-
tica entre los intereses de los consumidores, la Autoridad y
la legislación y reglamentación federal. Después de todo, en
materia de aguas, "aunque el Congreso puede haber articu-
lado que el papel del estado es primario, en la realidad, el
gobierno federal ha asumido primacía, y los estados han que-
dado en un papel secundario . . .". (Traducción nuestra.)
Beck y Goplerud III, *op. cit.*

### III

Recapitulando, independientemente de los fundamentos
esbozados en la opinión del Tribunal, el aumento tarifario es
válido por operación del Art. 6 de la Ley Núm. 21. Éste ex-
cluye del trámite de tarifas temporales y permanentes las
situaciones surgidas como consecuencia *directa* o *indirecta*
atribuibles a los mandatos de la legislación y reglamentación
federal. En la flexibilidad y pragmatismo de esta excepción
legislativa, descansa su virtud. Ello no debe sorprendernos,
pues "el hecho de que exista un margen de incertidumbre e
inseguridad en el sistema legislativo, de ningún modo inva-
lida la ley como un medio que satisface un anhelo de seguri-

dad jurídica. No se trata de una seguridad absoluta, sino relativa, que garantiza la evolución humana. Un cuerpo de leyes petrificado, por el cual cada ser humano pudiera saber con certeza qué va a suceder en el orden jurídico, serviría más bien a una comunidad de abejas. Orden y seguridad son valores, pero no los más altos. *El valor más alto es la justicia . . .*". (Énfasis suplido.) A.V. Fernández, *Función Creadora del Juez*, Buenos Aires, Ed. Abeledo-Perrot, 1970, pág. 47.