PARTIDO DE RENOVACIÓN PUERTORRIQUEÑA, peticionario y recurrido, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, HON. CÉSAR R. VÁZQUEZ DÍAZ, PRESIDENTE DE LA COMISIÓN ESTATAL DE ELECCIONES, y CARMEN ANA CULPEPER, SECRETARIA DE HACIENDA, demandados, y recurrente la segunda.

*Números:* R-84-341, R-84-345    *Resueltos:* 17 de septiembre de 1984

*Manuel D. Herrero,* de *Herrero, Castro & Porrata Doria,* abogado del recurrente.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

La igualdad es ingrediente medular del ideal de justicia que constantemente late en la Constitución. Por su naturaleza dinámica es susceptible de manifestarse en diversas dimensiones.

Este recurso permite su examen con referencia al reclamo[1] del Partido de Renovación Puertorriqueña (P.R.P.)

---

[1] El peticionario recurrido P.R.P. dio por sometidos los recursos el pasado 30 de agosto de 1984. Por su parte, al día de hoy los demandados recurrentes no han

a designar sus representantes en las Juntas de Inscripción Permanentes de las Comisiones Locales de Elecciones con los mismos derechos y prerrogativas de los correspondientes a los partidos principales.

El Tribunal Superior, Sala de San Juan, en elaborada opinión resolvió que dicho partido era acreedor a esa representación al detectar una infracción fundamental al principio de la igual protección de las leyes plasmado en la Sec. 1 del Art. II de la Constitución del E.L.A. Basó su dictamen en un cuidadoso análisis del historial previo y diseño legislativo de la actual Ley Electoral (Núm. 3 de 10 de enero de 1983) y la trayectoria de nuestra doctrina jurisprudencial. Procede confirmar.

## I

A modo de inventario, es menester una exposición preliminar de varios hechos y premisas pertinentes en materia electoral reconocidas expresamente en el dictamen de la ilustrada sala sentenciadora.

*Primero.* La nueva Ley Electoral es producto del consenso de una comisión especial integrada por un presidente y un representante de los tres partidos políticos inscritos al 2 de julio de 1981. Introdujo cambios sustanciales, "particularmente, en la estructura administrativa del sistema electoral". Sentencia, pág. 3.

*Segundo.* La Asamblea Legislativa "confirió a los partidos políticos la dirección del proceso electoral con participación en las estructuras principales, intermedias y locales. Dicha ley adoptó un sistema de participación, balance y fiscalización por los partidos políticos". Sentencia, pág. 3.

---

presentado el suyo. Reglamentariamente sus alegatos vencerían el 30 de septiembre.

Debido a la urgencia del asunto, bajo la Regla 50 de nuestro Reglamento hemos prescindido de los términos regulares y acordado esta decisión con el beneficio y evaluación de los planteamientos de sus escritos originales en apoyo de su expedición.

*Tercero.* Como regla general, la ley confiere iguales derechos y prerrogativas a los partidos políticos principales y a los de petición en cuanto a la representación en la Comisión Estatal de Elecciones, en las Comisiones Locales de Elecciones *permanentes*, en las Juntas de Unidad Electoral y en las de colegio.

*Cuarto.* El P.R.P. *no* tiene representación en las Juntas de Inscripción Permanentes, "que hoy por hoy es el organismo que sirve de base a todo el sistema. Es a este nivel donde por primera vez el ciudadano acude a reclamar sus derechos electorales y donde se inicia el proceso electoral. Al descentralizarse el sistema, éstos organismos han cobrado una importancia vital y para comprobar esto no hay nada más que visitar los locales donde ubican dichas Juntas. Aquí es donde se genera el trabajo con el cual luego van a intervenir los diferentes organismos del sistema electoral. Estas Juntas bregan con el proceso continuo de inscripción, transferencia y reubicación de electores, con el proceso continuo de fotografía y entrega de éstas, asignación de electores a su unidad electoral, preparación de informes requeridos, recusación de electores, etc.". Sentencia, págs. 10–11.

## II

La tesis principal de los recurrentes es que las funciones de las Juntas de Inscripción Permanentes, según previamente descritas, son simplemente trámites de tipo mecánico. Argumentan que tales labores no revisten de una importancia capaz de generar una adjudicación predicada en el principio constitucional de la igual protección. El argumento no nos persuade. Aparte de ser incorrecto es potencialmente peligroso como método de adjudicación electoral.

Si bien las funciones de estas juntas constituyen en gran medida trámites de índole burocráticos, ciertamente su importancia no puede subestimarse. No todo se reduce a un automatismo o meras rutinas. La eficaz realización de sus

labores requiere un grado razonable deliberativo y decisorio por parte de sus funcionarios.

■ Por ende, es cuestionable afirmar que tales juntas no intervienen en una etapa crítica. Por el contrario, "el plan legislativo que implementa el derecho constitucional al sufragio se sirve del sistema de inscripción de electores con la participación de los partidos políticos". *P. S. P.* v. *Com. Estatal de Elecciones*, 110 D.P.R. 400, 441 (1980). La inscripción de un ciudadano como elector es el paso básico que le valida y cualifica para ejercitar el voto. Una vez completada surge una presunción de capacidad electoral.

A poco profundicemos, hemos de percibir que en su dinámica operacional, parte sustancial de toda la Ley Electoral —por la naturaleza inherente del proceso reglado— corresponde a un mandato legislativo plasmado estatutariamente mediante una exposición detallada de trámites y eventos de carácter mecánico. Esa minuciosidad de pasos a observarse, procesos a seguirse, términos a cumplirse, documentos y demás requisitos, son típicos de toda reglamentación legal en materia electoral. Por ello no puede minimizarse su importancia y evaluación jurídica. Si como alegan los recurrentes se trata de trámites mecánicos inconsecuentes, ¿por qué razón entonces la Asamblea Legislativa concedió un representante a cada partido político principal? Al así hacerlo, ¿existe justificación válida para excluir a los partidos por petición? Exploremos estas interrogantes.

### III

■ El Art. VI, Sec. 4 de nuestra Constitución preceptúa que "[s]e dispondrá por ley todo lo concerniente al proceso electoral y de la inscripción de electores, así como lo relativo a los partidos políticos y candidaturas".

En virtud de ese lenguaje, la Asamblea Legislativa posee una amplia potestad para determinar y reglar todo lo concerniente al proceso electoral, inclusive los partidos políticos y candidaturas. Sin embargo, no es carta blanca ni "abso-

luta". *P.S.P., P.P.D., P.I.P.* v. *Romero Barceló,* 110 D.P.R. 248, 256 (1980). La reglamentación se rige por el axioma de igualdad inmerso en la Constitución.

■ El principio de igualdad electoral es continuo. Su génesis la encontramos en la Sec. 6 del Art. IX —Disposiciones Transitorias— de la Constitución. Reza:

> Los partidos políticos continuarán disfrutando de todos los derechos que les reconozca la ley electoral, siempre que reúnan los requisitos mínimos exigidos para la inscripción de nuevos partidos [políticos] por la ley vigente al comenzar a regir esta Constitución. *La Asamblea Legislativa,* cinco años después de estar en vigor la Constitución, *podrá cambiar estos requisitos, pero cualquier ley que aumente los mismos, no será efectiva hasta después de celebrada la elección general siguiente a la aprobación de la misma.* (Énfasis suplido.)

Al interpretarla percibimos que su espíritu trasciende su carácter temporal para dar cabida permanente al postulado rector que impregna la Carta de Derechos de la Constitución de que en una sociedad democrática todos los electores y partidos políticos "gozarán de iguales derechos". 4 Diario de Sesiones de la Convención Constituyente 2627 (1952).

■ Hoy en día no se discute cómo las Secs. 1 y 2 de la Carta de Derechos le imponen a la Asamblea Legislativa unas limitaciones al ejercicio de su amplia facultad para reglamentar la formación de los partidos políticos. Durante el cuatrienio en que aprueba la pieza legislativa no puede poner en vigor cambios que aumenten los requisitos de inscripción. Cualesquiera de tales modificaciones sólo pueden tener vigencia pasadas las elecciones generales ulteriores.

El principio igualitario expuesto intenta disuadir que en determinada época un partido, que controla mayoritariamente los poderes ejecutivo o legislativo, o lo comparta con otro —mediante anuencia o consenso— limite el nacimiento de otros partidos. También pretende evitar que se agrave la situación de los partidos de oposición existentes, o introduzca cambios de cualesquiera forma en las leyes y reglas que

rigen la contienda. electoral en beneficio y ventaja de determinado partido, en perjuicio de aquellos existentes o por inscribirse.

■ Como principio general aquella legislación que tienda a hacer onerosa y afectar negativa y sustancialmente las potencialidades de los partidos contrarios minoritarios o los partidos nuevos, o a crear situaciones de inferioridad, puede ser susceptible de impugnación constitucional.

■ La justificación de este enfoque es evidente. En nuestra democracia los partidos políticos son indispensables para su funcionamiento. Están investidos de poderes cuasi gubernamentales. Constituyen el vehículo de expresión colectiva ciudadana para canalizar pacíficamente las distintas tendencias políticas e intereses de los varios sectores de opinión del país. Como tales, formulan programas de administración y promueven candidatos a puestos políticos. El subsidio a través del fondo electoral para financiar sus actividades es un ejemplo vivo de esa característica pública. Véase *P. S. P.* v. *E. L. A.*, 107 D.P.R. 590, 610 (1978).

■ La realización de esas funciones cuasi gubernamentales y la asignación de fondos públicos justifican la igualdad en el tratamiento de la Ley Electoral.

■ Las estructuras administrativas creadas mediante la Ley Electoral deben responder a esa igualdad. La representación a todo nivel es esencial para un control y fiscalización recíprocos en apoyo de una garantía de la pureza electoral. *P. S. P.* v. *Com. Estatal de Elecciones*, supra. Si la representación no es total, es sostenible la conclusión de la ilustrada sala sentenciadora de que "la dirección del proceso electoral la llevan a cabo sólo los partidos políticos principales en contravención con la filosofía y letra de la Ley". Sentencia, pág. 20.

■ La clasificación entre partidos principales y por petición resulta, en el contexto de los hechos de este caso, irrazonable e injustificada.

En su apoyo, sólo se nos ha señalado lo expresado en el caso de *Martínez* v. *Junta Insular de Elecciones*, 43 D.P.R. 413, 417 (1932), en el sentido de que un partido político por petición no tenía derecho a tener un representante ante la entonces Junta Insular de Elecciones, en igualdad con los demás partidos principales, pues la propia Ley Electoral que existía (Núm. 3 de 6 de julio de 1932) no lo reconocía. Como justificación se adujo que dicho partido no había demostrado su fuerza electoral. Se recomendó un observador.

Ese estado del derecho permaneció así hasta que por primera vez, la Ley Núm. 411 de 23 de abril de 1946 concedió esa representación también a los partidos por petición. Ese era el marco jurídico en materia electoral que tuvo ante sí la Convención Constituyente. Aprobada la Constitución, subsistió tal enfoque por más de tres décadas. A tal efecto encontramos lenguaje en la legislación electoral subsiguiente —en cuanto a los organismos locales encargados de dirigir y supervisar las inscripciones— que otorgaba plena igualdad representativa a todos los partidos políticos. A manera de ejemplo, bajo el Código Electoral, Ley Núm. 1 de 13 de febrero de 1974, las denominadas Juntas Locales se componían de "un representante y un sustituto por cada uno de los partidos políticos con derecho a ello . . .". Art. 5-002. De igual modo la Ley Electoral Núm. 4 de 20 de diciembre de 1977 integraba las Juntas de Colegio con representantes y sustitutos de los partidos políticos. No se establecían diferencias entre los partidos principales y por petición. La distinción que nos ocupa resurge en la actual legislación que habla sólo de "un representante de cada uno de los partidos políticos principales". 16 L.P.R.A. sec. 3024a.

▬ El argumento de los recurrentes es improcedente por varias razones. Primero, cuando hace medio siglo se resolvió el caso *Martínez* v. *Junta Insular de Elecciones*, supra, no estaba vigente la actual Constitución. Tampoco había evolucionado con la intensidad jurídica valorativa del

presente, el principio igualitario electoral de representación para partidos principales y por petición que nació en el 1946 y permaneció hasta el 1983. En *P. S. P.* v. *Com. Estatal de Elecciones*, supra, pág. 410, citando a *Martínez*, supra, ampliamos su horizonte al expresar "que la presencia con voz y voto de un representante de cada partido político, es 'una cuestión de juego limpio o como una garantía adicional de una elección honrada e imparcial' . . . ". No podemos dar marcha atrás a ese adelanto cristalizado en nuestra jurisprudencia. Los partidos políticos son movimientos que aglutinan intereses ciudadanos. El respaldo necesario para inscribir y conferir franquicia oficial a un partido por petición, de por sí es suficiente para que surta efecto plenario esa condición. Negar ab initio esa igualdad es rehusar reconocer esa realidad.

La desigualdad bajo la ley se manifiesta más nítidamente en el aspecto económico. La plena representación de que gozan los partidos políticos principales conlleva que a sus funcionarios el Estado les pague. La negativa a reconocer los del P.R.P. implica que dicha colectividad tiene que descansar en electores voluntarios para descargar sus funciones o absorber sus gastos, recargando así su presupuesto operacional. Estos gastos son diarios, pues distinto al enfoque de pasadas leyes electorales que autorizaban sólo inscripciones una o dos veces al año, las juntas en cuestión son permanentes. El impacto fiscal ha recaído sobre los electores del P.R.P., a distinción de los demás partidos que han sufragado el mismo mediante aportación gubernamental.

Nuevamente estamos ante un esquema legislativo en que se favorece a unos partidos políticos. Se concede a éstos fondos públicos adicionales. Se amplían indirecta y ventajosamente de ese modo los dineros disponibles ya previstos y autorizados bajo el Fondo Electoral. Art. 3.023 y 3.026 de la Ley Electoral, 16 L.P.R.A. secs. 3116 y 3118. ¿Por qué este tratamiento diferente y perjudicial? ¿Qué razón de peso sostiene la clasificación? ¿Será una fidelidad ciega y a des-

tiempo al caso de *Martínez* v. *Junta Insular de Elecciones*, supra?

■ Lo expuesto nos convence que el impacto fiscal de una decisión favorable al P.R.P. no es argumento válido que derrote su derecho. Todo lo contrario. Mientras mayor sea, pone de relieve la injusticia y desigualdad de la ley. Demuestra cómo los partidos políticos principales se han beneficiado económicamente al ser sus representantes remunerados con fondos públicos. Contra la observancia de los preceptos constitucionales no pueden oponerse escollos salvables de tipo económico o burocrático. Es menester mover los resortes de la maquinaria electoral en la consecución de tal fin. *P.S.P.* v. *Tribunal Electoral*, 104 D.P.R. 230 (1975).

■ Recapitulando, existe un trato discriminatorio e injustificado contra el P.R.P. en las Juntas de Inscripción Permanentes. Los dos aspectos son claves: desigualdad para realizar una fiscalización recíproca en los procesos inscripcionarios y desigualdad en el tratamiento económico. La clasificación fundada en partidos principales y por petición es insostenible bajo cualesquiera análisis jurídicos. Afecta indebidamente a electores de esa colectividad. Correctamente el tribunal de instancia resolvió que "[u]na vez reconocida y conferida la franquicia electoral a un partido no puede sostenerse válidamente un trato desigual en materia de representación en los diferentes organismos que crea la Ley Electoral ni en materia de ayuda económica gubernamental. Desde esta perspectiva el Artículo 1.024 es discriminatorio por privar a la parte demandante de igual representación en las Juntas de Inscripción Permanente e infringir la cláusula de la igual protección de las leyes". Sentencia, pág. 24. La exclusión no puede prevalecer.

## IV

■ Cuando un estatuto resulta defectuoso por exclusión existen dos vías remediales: declarar su nulidad y negar sus

beneficios a toda la clase beneficiada legislativamente, o extenderlos para incluir a los perjudicados con la exclusión.

En *Milán Rodríguez* v. *Muñoz,* 110 D.P.R. 610, 618–619 (1981) nos pronunciamos del siguiente modo:

> En materia de hermenéutica constitucional y ante estatutos que adolecen de inconstitucionalidad por sub-inclusión, se reconoce la facultad de los tribunales de extender los beneficios estatutarios a aquellos grupos o clases excluidos. . . . La regla es consustancial con el principio de que el Poder Judicial —en abono de una deferencia hacia el Poder Legislativo— debe esforzarse por lograr interpretaciones congruentes y compatibles con el mantenimiento de la constitucionalidad de una ley. En su operación, a diferencia de éste, sin embargo, el impedimento constitucional podrá ser salvado, no mediante la interpretación del texto que por sus claros términos no es susceptible de serlo de otra manera, sino por la extensión de los beneficios a la clase excluida. El propósito legislativo, que quedaría frustrado con la anulación del estatuto, queda así en vigor y se supera el discrimen. (Escolios omitidos.)

■ Ese remedio se impone en el caso de autos. Negar a los partidos principales la representación actual trastocaría sustancialmente la implementación eficiente de la Ley Electoral. Rechazamos ese camino. Para superar el desbalance optamos por reconocer el derecho del Partido de Renovación Puertorriqueña a nombrar sus representantes en las Juntas de Inscripción Permanentes, con plenos derechos y prerrogativas, inclusive la económica, igual que aquellos que ostentan los representantes de los partidos políticos principales.

*Debe confirmarse.*