916

Partido Popular Democrático et al., recurridos, v. Pedro Rosselló González et al., peticionarios. Isabel Pérez Pérez et al., recurridos, v. Estado Libre Asociado de Puerto Rico et al., peticionarios. Rubén Berríos Martínez et al., recurridos, v. Pedro Rosselló González et al., peticionarios. Eudaldo Báez Galib et al., recurridos, v. Comisión Estatal de Elecciones et al., peticionarios.

Números: CE-94-584    Resueltos: 8 de septiembre de 1994
CE-94-588

Jorge C. Pizarro, Marie Elsie López Adames, y Lizette Vélez Rivé, abogados de la parte peticionaria; José Enrique Colón Santana y Edgardo N. Román Espada, abogados de la parte recurrida.

PER CURIAM: Nos corresponde resolver si erró el Tribunal Superior, Sala de San Juan (Hon. Gilberto Gierbolini, hijo), al prohibir que, para el referéndum que ha de celebrarse el próximo 6 de noviembre, las agencias del Gobierno incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública; esto es con excepción de aquellos avisos y anuncios de prensa expresamente requeridos por ley, así como aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos con autorización previa al efecto de la Comisión Estatal de Elecciones (C.E.E.). *Confirmamos el dictamen del tribunal de instancia.*

I

El 2 de agosto de 1994 la Asamblea Legislativa aprobó la Ley Núm. 49 —conocida como Ley Habilitadora del Referéndum sobre Enmiendas a la Constitución de Puerto Rico de 1994 (Ley Habilitadora del Referéndum), 16 L.P.R.A. sec. 956 *et seq.*— que autoriza la celebración de un referéndum el 6 de noviembre de 1994, en el cual los electores debidamente inscritos expresarán su aprobación o rechazo a las enmiendas propuestas al párrafo 5 de la Sec. 11, Art. II; la Sec. 3, Art. V; la Sec. 20, Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1.

Se instaron varias demandas contra el Hon. Pedro Rosselló González (Gobernador de Puerto Rico), la C.E.E. y el Estado Libre Asociado de Puerto Rico —por conducto del Departamento de Salud, la Policía de Puerto Rico, la Compañía de Turismo y la Autoridad de Energía Eléctrica— para impugnar esta ley por ser inconstitucional y solicitar, entre otras cosas, que se ordene al Gobernador y a las corporaciones públicas demandadas, con sus Directores Ejecutivos y Juntas de Directores, detener sus campañas publicitarias en los medios de difusión pública del país.

El 15 de agosto de 1994 el tribunal de instancia celebró una vista en la cual consolidó las demandas, escuchó los argumentos de las partes y le concedió un (1) día a los demandados para que mostraran causa por la cual no debía decretarse como aplicable al referéndum actual el Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351.([1])

Considerados los memorandos de las partes, el tribunal de instancia resolvió que el referido Art. 8.001 tiene plena vigencia en lo referente al referéndum programado para el 6 de noviembre de 1994 y, en consecuencia, ordenó a la C.E.E. a nombrar la Junta de Anuncios para que ésta pueda evaluar la necesidad de publicación de todo anuncio gubernamental hasta el día del referéndum. Se fundamentó para ello en el hecho de que la Ley Habilitadora del Referéndum dispone, en su Art. 5 (16 L.P.R.A. sec. 956d), que la Ley Electoral de Puerto Rico se considerará suple-

---

([1]) Dicho artículo dispone que:

"Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, que a partir del 1ro. de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes. Se exceptúan de esa disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.

"Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones." 16 L.P.R.A. sec. 3351.

toria a dicha ley habilitadora. Igualmente fundamentó su decisión en el principio de igualdad económica electoral inmerso en la Constitución.

No conformes, acuden ante nos los codemandados, Estado Libre Asociado de Puerto Rico (E.L.A.) y la Compañía de Turismo, mediante peticiones de *certiorari*, en las cuales solicitaron la revocación de la resolución y orden recurrida.

Básicamente ambos alegaron como errores que el remedio concedido por el tribunal de instancia constituye una violación al derecho de libertad de expresión del Gobierno y su deber de informar al pueblo; además, que implica, a su vez, una censura previa. Asimismo, plantean que erró el tribunal de instancia al aplicar el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, a la Ley Habilitadora del Referéndum, por ser dicho artículo incompatible y estar contra la intención legislativa. La peticionaria, Compañía de Turismo, también alegó como error que el tribunal de instancia debió abstenerse de intervenir por tratarse de una cuestión política no susceptible de adjudicación judicial, puesto que el tribunal de instancia había trascendido la esfera de sus poderes judiciales al inmiscuirse en la esfera legislativa.

Ordenamos la consolidación de las peticiones y concedimos a todas las partes un término para expresar sus posiciones.

Ante nos comparecieron como opositores: Eudaldo Báez Galib y Movilización Civil; Asociación Nacional de Estudiantes de Derecho y otros; Rubén Berríos Martínez, el P.I.P. y Manuel Rodríguez Orellana; el P.P.D, Modesta Alberty Vélez y Esteban Rodríguez Estrella. Éstos alegan que resulta aplicable el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, al referéndum de 1994, en virtud del principio constitucional de igualdad de derechos y de tratamiento a todos los partidos políticos; que según lo resuelto por este Tribunal en *Sánchez y Colón v. E.L.A. I*, 134 D.P.R. 445 (1993), los postulados igualitarios constitucio-

nales al voto son de igual aplicación a los referéndum y a las elecciones generales; que la Ley Electoral de Puerto Rico, en su definición de "elecciones", incluye tanto a los referéndum como a las elecciones generales; que la controversia no es una cuestión política sino de entera competencia de los tribunales; que no le asiste al Gobierno el derecho constitucional a la libre expresión por ser éste un derecho de los individuos frente al Estado, y que el Estado debe permanecer neutral y no debe manipular directa o indirectamente la formulación y expresión de la voluntad del pueblo, en aras de proteger al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral.

Igualmente compareció la C.E.E. y su Presidente para señalar que la controversia sobre la aplicabilidad del Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, al Referéndum de 1994 fue planteada ante dicho organismo, luego de resolver que éste resulta inaplicable por referirse sólo al año electoral y a las elecciones generales. Habiendo comparecido las partes antes identificadas, estamos en posición de resolver.

## II

La doctrina de cuestión política, como regla general, impide la revisión judicial de asuntos cuya resolución corresponde a las otras ramas políticas del Gobierno o al electorado. *Noriega Rodríguez v. Jarabo*, 136 D.P.R. 497 (1994). Se ha reconocido —por este Tribunal— que en virtud de la Sec. 4 del Art. VI de nuestra Constitución, L.P.R.A., Tomo 1, la Asamblea Legislativa posee un amplio margen de autoridad para legislar en asuntos de materia electoral. Véanse: *P.R.P. v. E.L.A.*, 115 D.P.R. 631, 636 (1984); *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 256 (1980); *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741, 744 (1976). En consecuencia, la Asamblea Legislativa posee una amplia potestad para determinar y reglamentar

todo lo concerniente al proceso electoral. No obstante, hemos sostenido *que ello no es carta blanca ni absoluta.* Véanse: *P.R.P. v. E.L.A.*, supra; *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, supra. La reglamentación se rige por el axioma de igualdad inmerso en la Constitución. *P.R.P. v. E.L.A.*, supra. De ahí que en el presente caso, al haber invocado el derecho constitucional de la igualdad electoral, resulta claro que no se plantea una cuestión política. Se trata del postulado rector que impregna la Carta de Derechos de la Constitución de que, en una sociedad democrática, todos los electores y partidos políticos "gozarán de iguales derechos". 4 Diario de Sesiones de la Convención Constituyente 2627 (1952). Recordemos que radica en este Tribunal la función de ser intérprete final de las leyes y la Constitución, así como la definición de sus contornos y la determinación de la validez de su ejercicio. Véanse: Art. V, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1; *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994); *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977).

### III

Ambos peticionarios plantean que el remedio concedido por el tribunal de instancia constituye una violación al derecho de libertad de expresión del Gobierno y a su deber de informar al pueblo, además de que implica, a su vez, una censura previa.

Los derechos contenidos en la Carta de Derechos le asisten *a los individuos frente al Estado.* Esos derechos no pueden extenderse a las expresiones del Gobierno porque los derechos están formulados en términos de lo que el Gobierno no puede hacer con relación a la expresión de las personas y no a la inversa. De ahí que el Gobierno no tiene un derecho constitucional a la libre expresión protegido. El problema ante nos implica el axioma básico de que el proceso decisional puertorriqueño responde en su realidad al postulado de igualdad inmerso en

nuestra Constitución, el cual persigue lograr paridad económica entre los partidos políticos para la divulgación de ideas y mensajes en nuestro país. Véanse: *Marrero v. Mun. de Morovis*, 115 D.P.R. 643, 646 (1984); *P.N.P. v. Tribunal Electoral*, supra, pág. 753. De ello resulta que existe un amplio poder en la limitación de la propaganda gubernamental.

■ Por otro lado, no se veda completamente los anuncios gubernamentales, puesto que existe un mecanismo provisto por la C.E.E., que pasará juicio sobre el anuncio, para autorizarlos si ello corresponde. Dicha determinación está sujeta a revisión por parte de los tribunales. Recordemos que se trata de un interés apremiante en proteger el derecho constitucional de igualdad, que existe un interés en que el Estado y sus instrumentalidades se mantengan neutrales, salvaguardando así el principio de libre selección del pueblo contenido en la Sec. 2 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1.

## IV

Ambos peticionarios plantean que erró el tribunal de instancia al aplicar el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, a la Ley Habilitadora del Referéndum por ser dicho artículo incompatible y en contra de la intención legislativa.

■ El Art. 5 de la Ley Habilitadora del Referéndum, *supra*, provee que la Ley Electoral de Puerto Rico y los reglamentos aprobados en virtud de ésta se considerarán *supletorios* a la Ley Habilitadora del Referéndum en todo aquello necesario, pertinente y compatible con sus propósitos, y para lo cual no se hubiese dispuesto un régimen distinto. De ahí que la controversia está dirigida a si el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, es necesario, pertinente y compatible con la Ley Habilitadora del Referéndum. Veamos.

La Sec. 2 del Art. II de nuestra Constitución, *supra*, establece que las leyes garantizarán la expresión de la voluntad del pueblo mediante el *sufragio universal*, igual, directo y secreto, y que protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral. Surge de la discusión de dicha sección en el Diario de Sesiones de la Convención Constituyente que "[l]a comunidad de hombres iguales y libres organiza su sociedad política con arreglo a la voluntad general y remite a ésta periódicamente las *cuestiones públicas en controversia, así como las candidaturas para el ejercicio del poder político. La ciudadanía actúa en ambos extremos como árbitro final*". (Énfasis suplido.) Diario de Sesiones, *supra*, pág. 2563. De ahí que el derecho constitucional del sufragio *sea un elemento común* a las elecciones generales y los referéndum. Ello fue reiterado por este Tribunal en *Sánchez y Colón v. E.L.A. I*, supra, pág. 449, en el cual se señaló que

> [t]anto nuestro ordenamiento constitucional como el norteamericano han reconocido a cabalidad la condición fundamental y preeminente *del derecho al sufragio*. El Preámbulo de nuestra Constitución destaca su importancia para el sistema democrático al anunciar que "el orden político está subordinado a los derechos del hombre y donde se asegura la libre participación del ciudadano en las decisiones colectivas...". *Preámbulo*, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 251.
>
> Estos postulados constitucionales protegen y garantizan el derecho al sufragio universal, *tanto en las elecciones generales como en los referéndum y en los plebiscitos*. ... (Énfasis suplido.)

De lo anterior surge con claridad que las elecciones generales y los referéndum *tienen como elemento común el derecho constitucional al sufragio*. Dicho derecho es consustancial con la existencia misma de la democracia.

Asimismo, dentro de nuestra Constitución está inmerso el principio de igualdad. Según expresara este Tribunal en *P.R.P. v. E.L.A.*, supra, pág. 633, "[l]a igualdad es ingrediente medular del ideal de justicia que constantemente late en la Constitución. Por su naturaleza

dinámica es susceptible de manifestarse en diversas dimensiones". Según lo resuelto por este Tribunal en *Marrero v. Mun. de Morovis*, supra, pág. 646, "[a]l presente, en materia electoral no se cuestiona seriamente el postulado de igualdad inmerso en nuestra Constitución. Históricamente ese ideal ha cobrado vida en el esquema integral financiero trazado por la Asamblea Legislativa para lograr paridad económica entre los partidos políticos y los candidatos". El concepto de igualdad económica, con relación a la distribución de fondos públicos en el proceso electoral, impide que un partido que ostente el poder de gobernar al pueblo en un momento dado utilice fondos públicos para tomar ventaja indebida dirigida a promover su postura. El Art. 8.001, *supra*, es precisamente una medida preventiva para que no ocurra dicha práctica indebida. Por lo tanto, el referido artículo, por imperativo del axioma de igualdad inmerso en la Constitución, así como en protección del derecho constitucional a la libre selección traducido en el derecho al sufragio, resulta compatible y consecuentemente aplicable a la Ley Habilitadora del Referéndum. En aras de mantener un proceso democrático, no podemos permitir una ventaja indebida del partido que esté en el Gobierno para promover su postura mediante la utilización de fondos públicos.

## V

*Resumiendo*, bajo el principio constitucional de igualdad económica que permea todo sufragio —que el Estado viene llamado a garantizar y que este Tribunal tiene que proteger al amparo de la Sec. 2 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*— procede que extendamos la prohibición que contiene el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, y la apliquemos a este caso para evitar que el Estado, mediante anuncios gubernamentales, pueda tener una influencia en la libre expre-

sión de los ciudadanos en la votación, con el poder económico que éste tiene mediante la utilización de fondos públicos.([2])

El tribunal de instancia mantendrá jurisdicción sobre las decisiones que tome la C.E.E. en vista de que ordenó la reactivación de su Junta de Anuncios como organismo administrativo especializado.

*Se emitirá la sentencia correspondiente.*

El Juez Asociado Señor Negrón García concurrió y disintió por los fundamentos expuestos en su Opinión disidente emitida el 2 de septiembre de 1994 para estos recursos. El Juez Asociado Señor Hernández Denton emitió un voto particular de conformidad. El Juez Asociado Señor Rebollo López disintió con opinión escrita.

---

([2]) Los peticionarios plantearon, además, que el tribunal de instancia estuvo contra la intención legislativa, toda vez que del Informe Conjunto de la Comisión de Gobierno y la Comisión de Hacienda para el P. de la C. 1463 de 19 de julio de 1994, surge que allí se concluyó que por sus propios términos no aplica el Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, debido a que éste sólo cubre elecciones generales. Si bien es cierto que en el referido informe se indica que este Art. 8.001 no aplicará, lo cierto es que en la redacción final aprobada de la ley *no se incorporó esa prohibición*, sino que se dispuso meramente que la Ley Electoral de Puerto Rico aplicará de forma supletoria en todo aquello que sea necesario, pertinente y compatible. Según concluimos antes, el referido artículo resulta totalmente necesario, pertinente y compatible con la Ley Habilitadora del Referéndum sobre Enmiendas a la Constitución de Puerto Rico de 1994, en virtud del axioma de igualdad inmerso en la Constitución, así como en protección del derecho constitucional al sufragio. Resolver lo contrario sería ir en contra de la norma reconocida de que un tribunal no está autorizado, bajo el pretexto de buscar la intención legislativa en un estatuto, a adicionarle limitaciones o restricciones que no aparecen de su texto. Véase *Román v. Superintendente de la Policía*, 93 D.P.R. 685, 688–689 (1966). Recordemos que el texto claro de la ley es la expresión por excelencia de la intención legislativa. Véanse: *Ferretería Matos, Inc. v. P.R. Tel. Co.*, 110 D.P.R. 153 (1980). Siendo, pues, claro el texto de la ley, resulta innecesario recurrir al informe conjunto de la cámara para conocer la intención legislativa. *Meléndez Ortiz v. Valdejully*, 120 D.P.R. 1 (1987); *Ferretería Matos, Inc. v. P.R. Tel. Co.*, supra. Además, una expresión aislada no puede considerarse como un mandato en lo que respecta a la interpretación sobre el propósito de una ley.

— O —

Opinión de conformidad emitida por el Juez Asociado Señor Hernández Denton.

Estoy de acuerdo con la opinión *per curiam* emitida por este Tribunal en la cual se confirma el dictamen del Tribunal Superior que prohibió a las agencias del Gobierno incurrir en gastos para la compra de tiempo y espacio en los medios de difusión pública sin seguir el procedimiento dispuesto por el Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351.

Coincido con la posición mayoritaria en el sentido de que "bajo el principio constitucional de igualdad económica que permea todo sufragio —que el Estado viene llamado a garantizar y que este Tribunal tiene que proteger al amparo de la Sec. 2 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*— procede que extendamos la prohibición que contiene el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra* ...". Opinión mayoritaria, pág. 927.

La Sec. 2 del Art. II dispone:

> Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral.[1] Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 261.

Al aprobarse la Constitución de Puerto Rico hubo un compromiso colectivo de desarrollar un país donde sus ciu-

---

[1] Existen cuatro (4) variedades de derechos humanos: (1) *status negativus libertatis*, que representa la reserva de libertad del individuo fuera del poder del Estado; (2) *status positivus civitatis*, que presenta las esferas de acción que tienen que estar disponibles para el individuo en todo momento; (3) *status activae libertatis*, que concierne los derechos relativos a la participación en el poder, y (4) *status creditoris*, que exige una acción positiva del Estado en beneficio del individuo. J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. Universitaria, 1982, Vol. III, pág. 200. La Sec. 2 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, representa uno de los derechos conocidos como *status activae libertatis*.

dadanos disfrutaran plenamente de libertad individual y de justicia social en una sociedad democrática. Por tal razón, se diseñó un ordenamiento constitucional en el cual el Estado tiene el deber de proteger los derechos humanos y, simultáneamente, propiciar las condiciones económicas y políticas necesarias para garantizar la justicia social. En este esquema corresponde al Estado la función dual de no intervenir con los derechos individuales y, a la vez, propiciar las condiciones sociales y económicas que permitan que todos los puertorriqueños disfrutemos de esas libertades en igualdad de condiciones.

La Sec. 2 del Art. II de nuestra Constitución, *supra*, consagra el principio básico de que el poder político emana del consentimiento y la voluntad popular al imponer al Gobierno una responsabilidad dual: abstenerse, por un lado, de interferir con el ejercicio del sufragio universal, igual, directo y secreto, y por otro, proteger al ciudadano contra toda coacción en el ejercicio de tal prerrogativa electoral. Se trata, pues, de un deber afirmativo, que lo obliga de igual forma en elecciones generales y en referéndums y plebiscitos. *Sánchez y Colón v. E.L.A. II*, 134 D.P.R. 503 (1993); *Sánchez y Colón v. E.L.A. I*, 134 D.P.R. 445 (1993).

De esta disposición constitucional surge un axioma de igualdad electoral que es incompatible con el uso indebido de los fondos públicos, por el Gobierno, para propaganda político-partidista. Esto es, porque se afecta detrimentalmente el derecho de los electores a ejercer su voto libre de cualquier coacción y se pone en desventaja económica a los demás partidos. La propaganda excesiva por parte del Gobierno durante un sufragio constituye una forma abierta y velada de coacción electoral con el propósito de beneficiar al partido que controle la Rama Ejecutiva, permitiéndole obtener una ventaja indebida sobre los demás.[2] *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368, 396 (1984)

---

[2] En el pasado hemos reconocido el inmenso poder de la propaganda sobre la opinión pública:

(citando la Exposición de Motivos de la Ley Núm. 1 de 13 de febrero de 1974, Leyes de Puerto Rico, pág. 3; *P.R.P. v. E.L.A.*, 115 D.P.R. 631, 637 (1984); *Marrero v. Mun. de Morovis*, 115 D.P.R. 643, 645 (1984); *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248 (1980); *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741, 756 (1976). Esta práctica es contraria a nuestro ordenamiento democrático y a los principios de igualdad que rigen nuestro sistema constitucional.

Nuestra cláusula del sufragio no tiene igual en la Constitución de Estados Unidos. Sin embargo, la Jurisprudencia norteamericana ha aplicado la Primera Enmienda de la Constitución de Estados Unidos, L.P.R.A., Tomo 1, para exigir neutralidad en asuntos políticos a los gobiernos de los estados. Asimismo, el deber de neutralidad se ha reconocido como un requisito indispensable para promover la opinión libre y genuina de los ciudadanos, lo cual es una meta fundamental de toda democracia.

> La sugerencia de que la Primera Enmienda y la cláusula de garantía prohíban el partidismo oficial —sea en relación con la autoperpetuación en el cargo o con elecciones tipo referéndum y procesos relativos a enmiendas constitucionales— ni es nueva ni carece de apoyo jurisprudencial. Como aseveró el profesor Emerson:
>
> "No hay duda de que el Gobierno está obligado por la Constitución a no utilizar su poder de expresión, así como ningún otro poder, para coartar la libertad de expresión. Además, no resulta paradójico invocar la Primera Enmienda para limitar la expresión gubernamental. El propósito de la Primera Enmienda es proteger la expresión privada; no existe nada en esta garantía que impida al Gobierno controlar su propia expresión o la de sus agentes." (Traducción nuestra.) E. Ziegler, *Government Speech and the Constitution: The Limits of Official Partisanship*, 21 B. C. L. Rev. 578, 606 (1980).

---

"[L]os medios de comunicación de masas [pueden] elimina[r] el juego de la libertad de opinión y de palabra, por lo menos en su función social como mecanismo normal de la democracia, pues al lado de las pobres manifestaciones del pensamiento, según la forma tradicional, los nuevos recursos técnicos ... permiten 'fabricar' la opinión pública a través de sugestiones y símbolos mejor que a través de ideas y de apreciaciones razonables." Escuela de Administración Pública, *La nueva Constituión de Puerto Rico*, Río Piedras, Ed. U.P.R., 1954, pág. 212.

Se considera que la neutralidad del Gobierno es necesaria para evitar que se frustre la expresión pura y libre de los votantes y se le otorgue una ventaja indebida a la posición del partido de turno en el Gobierno:

> Los casos anteriores sugieren, con claridad, que la Primera Enmienda y la cláusula de garantía protejan el derecho de los ciudadanos a estar libres de partidismo oficial con relación a las cuestiones políticas estructuradas; puesto que dicha conducta podría disminuir el efecto de las expresiones políticas de los ciudadanos que objeten las medidas y le den una ventaja injusta a los grupos que compitan en la política privada. Los casos también sugieren que este tipo de partidismo oficial no constituya una función gubernamental adecuada en un sistema de gobierno republicano, en el cual la autodeterminación se alcanza a través de los procesos democráticos. En este aspecto, no existe una distinción lógica entre unas elecciones para adoptar enmiendas constitucionales y unas elecciones que tengan que ver con asuntos oficiales referentes a una agencia federal o estatal en particular. El daño ocasionado a los ciudadanos con intereses contrarios en la expresión política es el mismo en ambos casos. Por esa razón, debe prohibirse el partidismo oficial por parte de las agencias federales y estatales con relación a propuestas estatales o a la ratificación de enmiendas a la Constitución federal. En todos estos casos se han violado derechos fundamentales y no existe un interés apremiante del Estado que justifique dicho daño.
>
> Se puede argumentar, además, que los actos partidistas oficiales, antes mencionados, violan de otra forma el sistema de la libre expresión protegido por la Primera Enmienda. En la medida que el partidismo oficial utilice fondos públicos para financiar un punto de vista partidista con el cual algunos contribuyentes no están de acuerdo, efectivamente, se está obligando a los contribuyentes, que no comparten ese punto de vista, a financiar una expresión política con la que no están de acuerdo. El Tribunal Supremo ha establecido desde hace tiempo que el Gobierno no puede obligar a una persona a expresar posiciones políticas o ideológicas que resulten inaceptables para esa persona. Conforme a las palabras de Tomás Jefferson, la razón fundamental es que "obligar a un hombre a contribuir económicamente a la divulgación de opiniones con lo que no está de acuerdo, es un acto pecaminoso y tiránico". (Traducción y énfasis nuestros.) Ziegler, *supra*, págs. 613–614.

En el pasado hemos reconocido que la expresión del Go-

bierno —de naturaleza educativa e informativa— es indispensable para que el pueblo pueda juzgar su labor y exigir remedios a los agravios gubernamentales. *Santiago v. Bobb*, 117 D.P.R. 153, 158 (1986); *Romero Barceló v. Hernández Agosto*, supra, pág. 381. Sin embargo, existe otro tipo de comunicación gubernamental que, lejos de cumplir la ineludible obligación de informar, constituye un bombardeo de propaganda parcializada que tiene el efecto de coaccionar el libre pensamiento del pueblo, además de malgastar sus escasos recursos económicos.

Podemos tomar conocimiento judicial de que, en los primeros seis (6) meses del presente año, las dieciséis (16) agencias de Gobierno —con mayor inversión publicitaria— incurrieron en gastos de publicidad en prensa y televisión ascendentes a casi doce millones de dólares ($12,000,000). Llama la atención que la mayor parte del gasto publicitario proviene de agencias que, por su naturaleza, son las únicas en ofrecer un servicio y para ejercer sus funciones no compiten con entidades privadas, pero que resultan neurálgicas en cuanto a la opinión pública y el apoyo que el pueblo decida brindar a las propuestas políticas de la administración de turno. Existe un peligro innegable de que al menos una parte de estos anuncios se esté utilizando indebidamente para fines político-partidistas, con el efecto de violar la Sec. 2 del Art. II de nuestra Constitución, *supra.*

Ante esta situación, la aplicación del mecanismo procesal del Art. 8.001, *supra*, resulta ser el remedio más práctico, justo y eficaz. La experiencia ha demostrado que este procedimiento administrativo de evaluación previa de anuncios permite que el Gobierno proceda con aquellas comunicaciones que con válidez puede emitir, mientras asegura que no se viole el derecho del pueblo a un sufragio libre de coacción. Es necesario enfatizar, por ende, que esta decisión no avala una veda total a los anuncios gubernamentales, sino que provee un procedimiento de evaluación para garantizar el respeto al derecho constitucional aquí

reseñado; evitando la emisión o publicación de anuncios diseñados para influir sutil e indebidamente en el pensamiento popular. Además, se protege el principio de igualdad económica durante un sufragio.

Por entender que el derecho a un voto libre de coacción queda adecuadamente protegido mediante el uso del mecanismo del Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, endoso la opinión del Tribunal.

## — O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

Algunas personas seguramente pensarán que disfrutamos enormemente el disentir de nuestros compañeros Jueces. *No* es así. Seríamos felices si pudiéramos endosar y suscribir la mayoría de las decisiones que emite este Tribunal. Desafortunadamente *no* es posible. Ello en vista de las *erróneas* decisiones que, *continuamente*, emite una mayoría de los integrantes del Tribunal; decisiones que hacen que, en ocasiones, nos cuestionemos si realmente vale la pena continuar en el cargo que con tanto orgullo ocupamos y desempeñamos.

En el día de hoy, mediante la opinión *per curiam* que se emite, el Tribunal *erróneamente confirma* una resolución interlocutoria que emitiera el Tribunal Superior de Puerto Rico, Sala de San Juan; resolución mediante la cual dicho foro judicial —*sin que ninguna de las partes demandantes lo hubiera solicitado y sin que se hubiera desfilado prueba alguna al respecto*— le prohibió a todas las agencias del Gobierno de Puerto Rico a incurrir en gastos para la compra de tiempo y espacio en los medios de difusión pública y a publicar dichos anuncios a menos que éstos fueran previamente aprobados por la Junta de Anuncios que se crea por la vigente Ley Electoral de Puerto Rico.

I

Un grupo de personas, partidos políticos y agrupaciones —a saber, el Partido Independentista Puertorriqueño, el Senador Eudaldo Báez Galib y una agrupación conocida como Movilización Civil, el Partido Popular Democrático, los Consejos de Estudiantes de Ciencias Sociales y de la Escuela de Derecho de la Universidad de Puerto Rico, y la Federación de Universitarios Pro Independencia— radicaron ante el Tribunal Superior de Puerto Rico, Sala de San Juan, varias demandas contra el Estado Libre Asociado, la Comisión Estatal de Elecciones, la Compañía de Turismo y la Policía de Puerto Rico, en las cuales se alegó, en síntesis y en lo pertinente, que la Ley Núm. 49 de 2 de agosto de 1994, conocida como Ley Habilitadora del Referéndum sobre Enmiendos a la Constitución de Puerto Rico de 1994 (16 L.P.R.A. sec. 956 *et seq.*), *es inconstitucional*; ello por diversos motivos. En consecuencia, en las *súplicas* de dichas demandas, *se solicitó llana y sencillamente una determinación del tribunal a esos efectos.* Nada más y nada menos.

El tribunal de instancia, luego de la celebración de una vista oral, *consolidó* todas las demandas radicadas y, *sin que ninguna de las partes se lo hubiera solicitado*, le concedió término al Estado para que mostrara causa por la cual no debía determinar que al mencionado "referéndum" le es aplicable las disposiciones del Art. 8.001 de la vigente Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351; ello en virtud de las disposiciones del Art. 5 de la propia Ley Núm. 49, *supra*, 16 L.P.R.A. sec. 956d. El Estado cumplió con lo ordenado.

Mediante la Resolución y orden de fecha 17 de agosto de 1994, el tribunal de instancia resolvió que las disposiciones del referido Art. 8.001 de la vigente Ley Electoral de Puerto Rico, *supra*, efectivamente le son aplicables al "referéndum" a ser celebrado el 6 de noviembre de este año.

En consecuencia, le ordenó a la Comisión Estatal de Elecciones que nombrara una "Junta de Anuncios", para la cual provee la vigente Ley Electoral, con el propósito de que "ésta [Junta] pueda evaluar la necesidad de publicación de todo anuncio gubernamental hasta el día del Referéndum". Resolución y orden de 17 de agosto de 1994, pág. 1.

Esto es, el tribunal de instancia, no obstante *posponer* la decisión sobre el asunto principal planteado, el de la constitucionalidad de la Ley Habilitadora del Referéndum, entendió procedente —sin que nadie, *repetimos*, se lo solicitara— *prohibir* que el Estado publicara anuncios sin el permiso y consentimiento de la Junta de Anuncios que crea la vigente Ley Electoral; tal y como se tratara de una elección general.

Inconformes, *naturalmente*, acudieron ante este Tribunal —vía *certiorari*— tanto los codemandados Estado Libre Asociado de Puerto Rico como la Compañía de Turismo de Puerto Rico en revisión de la mencionada determinación interlocutoria. En síntesis, plantearon que había errado el tribunal de instancia al aplicar, al "referéndum" en controversia, las disposiciones del citado Art. 8.001 de la Ley Electoral de Puerto Rico, ante, el cual, sostienen, únicamente es aplicable a una elección general.[1]

Mediante Resolución, de fecha 19 de agosto de 1994, una Sala Especial de Verano[2] consolidó ambos recursos y, a los fines de evaluar los mismos, le concedió término a

---

[1] *"Sec. 3351. Gastos de difusión pública del Gobierno*

"Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, *que a partir del 1ro. de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma,* incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros realizaciones, proyecciones o planes. Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.

"Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones." (Énfasis suplido.) 16 L.P.R.A. sec. 3351.

[2] Compuesta la misma por el Juez Presidente Señor Andréu García y los Jueces Asociados Señora Naveira de Rodón y Señor Alonso Alonso.

*todas* las partes "para que se expresen sobre estos recursos". En cumplimiento de esta resolución han comparecido tanto las partes demandantes recurridas como las partes demandadas peticionarias.

En el día de hoy, una mayoría de los integrantes del Tribunal confirma la resolución interlocutoria emitida por el foro de instancia exponiendo que los anuncios publicados por las agencias del Gobierno —*sobre los cuales, repetimos, no ha desfilado prueba alguna*— violan, en palabras de la mayoría, "el axioma [de igualdad] ... inmerso en la Constitución" y coaccionan a los ciudadanos de este País "en el ejercicio de la prerrogativa electoral".

## II

Somos los primeros en admitir que siempre existe *la posibilidad* de que la Rama Ejecutiva del Gobierno de Puerto Rico —*en un momento determinado de nuestra historia de pueblo, presente o futuro, y en relación con un evento electoral*— pueda *intentar* violar el referido axioma de igualdad y coaccionar a la ciudadanía en su prerrogativa electoral.

Ahora bien, *ello no lo puede presumir la Rama Judicial*; esto es, estamos obligados a partir de la premisa de que la Rama Ejecutiva, de cualquier administración de Gobierno, actúa correctamente y conforme a los dictados pertinentes de la Constitución y de las leyes aplicables al asunto ante nuestra consideración. En otras palabras, la parte que alegue y sostenga que así no lo ha hecho la Rama Ejecutiva tiene el peso de probarlo en una vista judicial plenaria.

En el presente caso, repetimos, tanto el tribunal de instancia como este Tribunal han decidido, motu proprio, activar y aplicar a la situación las disposiciones del Art. 8.001 de la Ley Electoral de Puerto Rico, ante; disposición de ley que, por su propio texto, *únicamente* es aplicable a las elecciones generales que se celebran en Puerto Rico

cada cuatro (4) años. *Ello lo han hecho sin que ninguna de las partes demandantes se lo hubiera solicitado y sin que se haya desfilado prueba sobre los anuncios que, supuestamente, está publicando el Gobierno de Puerto Rico.*

La razón para ello *es bien sencilla.* Los demandantes *no* han hecho dicha solicitud, *ni* han presentado prueba sobre dichos anuncios, *por la sencilla razón de que dicha solicitud resulta contradictoria con su posición de que la citada Ley Núm. 49 de 1994 es inconstitucional.* Esto es, a los demandantes *no* les interesa si los anuncios que publique el Gobierno son, o no, objetivos y neutrales. *Los demandantes sostienen que no procede la publicación de ningún anuncio; ello dado el hecho de que alegan que, por razón de que la citada Ley Núm. 49 es inconstitucional, el referéndum no se puede llevar a cabo.*

Siendo esa la situación, *ni* el tribunal de instancia *ni* este Tribunal realmente tienen "facultad" para, motu proprio, envolverse en un asunto o cuestión que las partes *ni* han solicitado *ni* les interesa. *Debe recordarse que nuestro sistema de derecho es rogado y de carácter adversativo.* Véase *Rodríguez Cruz v. Padilla Ayala,* 125 D.P.R. 486 (1990).

La *única* cuestión planteada ante el foro judicial lo es la constitucionalidad, o no, de la referida Ley Habilitadora del Referéndum de 1994. *No* hay razón jurídica alguna para que el foro judicial resuelva, *motu proprio y en el interín,* si deben o no aplicarse a la situación las disposiciones del citado Art. 8.001 de la vigente Ley Electoral de Puerto Rico. *Sobre todo cuando consideramos que no se ha presentado prueba alguna ante el foro judicial sobre supuesta conducta impropia por parte de la Rama Ejecutiva del Gobierno de Puerto Rico.* Ello, a nuestro juicio, puede constituir una violación al debido procedimiento de ley.

En resumen, resulta prematura y jurídicamente improcedente la actuación del foro de instancia prohibiéndole, en

estos momentos, a las agencias del Gobierno la publicación de anuncios sin la previa aprobación de la mencionada Junta de Anuncios. Dicha determinación únicamente resultará procedente hacerla en la alternativa, y luego, de que el foro judicial resuelva que la citada Ley Núm. 49 es constitucional; ello, naturalmente, previa solicitud de parte a esos efectos y luego de la presentación de la prueba correspondiente ante el foro judicial.

## III

Finalizamos señalando que somos del criterio que *toda* la actuación del Tribunal en el presente caso *puede* resultar nula. Como expresáramos el pasado 2 de septiembre de 1994, se le puede imputar a este Tribunal el tener un "interés particular y especial" en el caso. Hay que recordar que "no se puede ser juez y parte en un mismo caso".